# United States Court of Appeals for the Federal Circuit

2006-1359

Donald C. Winter, SECRETARY OF THE NAVY,

Appellant,

v.

CATH-DR/BALTI JOINT VENTURE,

Appellee.

Devin A. Wolak, Trial Attorney, Commercial Litigation Branch, Civil Division United States Department of Justice, of Washington, DC, argued for the appellant. On the brief were Peter D. Keisler, Assistant Attorney General, Deborah A. Bynum, Assistant Director, and Andrew P. Averbach, Attorney.

Douglas C. Proxmire, Patton Boggs, LLP., of Washington DC., argued for appellee. With him on the brief was Michael J. Schaengold.

Appealed from: United States Armed Services Board of Contract Appeals

Administrative Judge Elizabeth A. Tunks

# United States Court of Appeals for the Federal Circuit

2006-1359

Donald C. Winter, SECRETARY OF THE NAVY,

Appellant,

v.

CATH-DR/BALTI JOINT VENTURE,

Appellee.

_____

DECIDED: August 17, 2007

_____


Before LOURIE, PROST, and MOORE, Circuit Judges.

Opinion for the court filed by Circuit Judge MOORE.  Opinion dissenting-in-part filed by Circuit Judge PROST.

The Secretary of the Navy (Navy) appeals the decision of the Armed Services Board of Contract Appeals (Board) finding in favor of Cath-dr/Balti Joint Venture (Cath) on 13 of 37 claims for an equitable adjustment in contract price.  Cath-dr/Balti Joint Venture, ASBCA Nos. 53581, 54239, 05-2 BCA ¶ 33046 (Aug. 17, 2005) (Board Opinion).  The Navy asserts that the Board erred in concluding that a Resident Officer in Charge of Contracts[1] (ROICC), who was also the Project Manager (PM) during the performance period, had the authority to commit the government to compensable contract changes.  Because the contract explicitly reserved authority to modify the contract to the Contracting Officer (CO), the ROICC did not have actual express or

_____
[1]    Resident Officer in Charge of Construction and Resident Officer in Charge of Contracts are used interchangeably in the record.

implied authority to direct the contractor to perform compensable contract changes, and we reverse the Board's conclusion as to claims 2, 8, 13, 17, and 26/32. However, we affirm the Board decision on claim 3 because that claim is independently sustainable based on a differing site condition, which the Navy does not appeal. Finally, we remand claims 7, 33, and 37 to the Board to determine whether the ROICC's directives on these claims were ratified.

BACKGROUND

I.

On September 29, 1998, Cath and the Navy entered into a fixed price contract for external renovation of a historic dental research facility at the Great Lakes Naval Training Center in Illinois. The contract incorporates by reference several standard government clauses including Federal Acquisition Regulation (FAR) § 52.243-4 (Aug. 1987) (Changes Clause), which provides that the CO may, at any time, make changes in the work within the general scope of the contract by written order designated as a change order. FAR § 52.243-4 also provides that for any change affecting the contractor's cost or time of performance under the contract "whether or not changed by any such order, the [CO] shall make an equitable adjustment and modify the contract in writing." The contract also includes FAR § 52.236-2 Differing Site Conditions (April 1984), which requires that a contractor give written notice to the CO of subsurface, latent, or unknown physical conditions at the site that differ materially from those indicated in the contracting documents. After such notice, the CO "shall" investigate the site conditions and if they do materially differ and cause an increase in the cost of or time required for completion of the contract "an equitable adjustment shall be made under this clause and the contract modified accordingly" by the CO. Additionally, the

contract incorporates Naval Facilities Engineering Command (NAVFAC) Clause 5252.201-9300 Contracting Officer Authority (June 1994) and NAVFAC Clause 5252.242-9300 Government Representatives (June 1994). The Contracting Officer Authority clause reserves authority to the CO to bind the government to any "contract, modification, change order, letter or verbal direction to the contractor," and the Government Representatives clause indicates that while the Engineer in Charge (EIC) will be designated by the Contracting Officer as his authorized representative responsible for monitoring performance and technical management, in no event will any modification of the contract by anyone other than the CO bind the government.

## II.

Before work under the contract began, a preconstruction conference was held, as required by contract specification section 01110 "Summary of Work," paragraph 1.10, entitled "Preconstruction Conference." Paragraph 1.10 states that the conference will be held with the CO to "develop a mutual understanding" relative to the administration of the contract. The preconstruction conference attendees included numerous individuals from Cath and the Navy, including both the ROICC PM and EIC. Although the contract required that the CO attend the preconstruction conference, the CO was not present.

During the preconstruction conference, the Navy set forth its detailed guidelines for contract administration in a presentation that designated the ROICC PM to administer the contract and stated that all correspondence should be addressed to the attention of Lt. Ken Osmun—the active ROICC PM. The presentation directed the contractor to use the Requests for Information (RFI) form routinely and "[i]f necessary, forward RFI to *Navy PM* for action." The presentation included two slides related to

contract modification which state "[m]odifications are <u>written</u> alterations to the contract which may change the work to be performed and/or the contract price and time" and "[n]o work is to be performed beyond the contract requirements without <u>written notification from the ROICC</u>." Another slide related to disputes directed the contractor to submit a request for equitable adjustment to the ROICC if it feels a contract modification is required and "[i]f the ROICC sees no entitlement, or the contractor doesn't agree with the entitlement, the contractor has the right to request a Contracting Officer's Final Decision, using the procedures outlined in the Disputes Clause" but that "[t]he contractor must proceed diligently with the work while awaiting the final decision."

Cath began work under the dental facility contract on January 25, 1999. Soon thereafter, Cath received a letter from the Navy that reassigned the day-to-day administration of the contract to EIC Tim Meland and indicated that all correspondence regarding the contract should be sent to Meland's attention. In response to this letter, Cath submitted a RFI seeking "documentation of assignment of authority" and the "level of authority" of Meland, among others. The Navy responded to this RFI with respect to Meland as follows:

> Mr. Tim Meland. Project Manager: Serves as the Government Construction Manager on all assigned projects. Responsible for construction management and contract administration on assigned projects while providing quality assurance and technical engineering construction advice. Provides technical and administrative direction to resolve problems encountered during construction. A project manager analyzes and Interprets contract drawings and specifications to determine the extent of Contractors' responsibility. Prepares and/or coordinates correspondence, submittal reviews, estimates, and contract modifications in support to ensure a satisfactory and timely completion of projects.

During the course of the project, Meland and his successor received numerous RFIs from Cath that requested clarification of the contract requirements and gave notice

of site conditions that may require deviation from the contract specifications with a request for a decision. In each case, the ROICC PM signed the response to the RFI. When necessary, the PM asked for the architect/engineer's input, which was also provided to the contractor in the PM's response. Some of these responses included a preprinted statement that the response is a contract requirement, which the PM marked.

### III.

After Cath's renovation work under the contract was deemed substantially complete, it submitted a cumulative request for a contract modification and several adjustments to the PM, in accordance with the procedure for equitable adjustment requests set forth in the preconstruction conference presentation. The PM responded, indicating "we will thoroughly review the submitted documentation and will formally respond in writing at a future date." After the ROICC office failed to act on the request for five months, Cath submitted a certified request in December 2000.

A CO issued a 15 page Final Decision on July 27, 2001, detailing each claim and finding entitlement to an equitable adjustment for 12 claims. In this decision, the CO recommended that Cath and the ROICC office negotiate the amount Cath is entitled to for its meritorious claims and asked that Cath's request for a final decision on those claims be "held in abeyance subject to further discussions with the ROICC." Cath attempted on several occasions to meet with the Navy to reach an agreement as to the amount Cath should receive for these claims, but despite the CO's direction in the July 27 decision letter, inexplicably, the Navy refused to meet with Cath.

When this appeal was brought before the Board, it was Cath's position that only an accounting was needed for these twelve claims because of the CO's confirmation

that Cath was entitled to recover on those claims. The Board similarly viewed the July 27 decision as a concession to entitlement and issued a Show Cause Order requesting the Navy to explain why entitlement should not be granted to Cath on those twelve claims. The Navy responded that the July 27, 2001 decision was not a determination of entitlement. In a memorandum dated May 6, 2003, the Board indicated that the final decision "clearly concede[s] entitlement on these items, leaving only quantum to be resolved" and stated that the government's interpretation to the contrary was "unreasonable." Shortly thereafter, the Navy issued a second Final Decision two pages in length denying all of Cath's claims, including the twelve claims the CO previously determined had merit. Unlike the first, this second final decision contained no discussion of individual claims, but rather stated that because no additional data had been provided, the claims were denied for lack of entitlement. The Board then considered entitlement and damages for each claim anew.

The Navy argued for the first time on appeal that the CO did not direct the work set forth in the claims for equitable adjustment and that under the contract only the CO has the authority to change the scope of work or authorize compensable changes. In an order dated August 17, 2005, the Board sustained in whole or in part 13 of Cath's 37 claims. Board Opinion, slip op. at 81-83. With respect to all but one of the claims that the Navy has appealed to this court, the Board determined that the ROICC PM directed changes that resulted in costs beyond those required by the contract and that these changes were compensable because the delegation of authority clause in the contract gave him responsibility for construction management and contract administration. The Board concluded that Meland, as the PM, had "express actual authority" to resolve

minor problems that arose during the project based on the Navy's RFI response, which indicated that he was responsible for construction management and contract administration and that he was authorized to provide "'technical and administrative direction to resolve problems encountered during construction.'" <u>Board Opinion</u>, slip. op. at 9 (quoting <u>Urban Pathfinders, Inc.</u>, ASBCA No. 23134 79-1 BCA ¶ 13,709 at 67,260 (1979)). Additionally, the Board sustained entitlement to recover for claim 3 under the contract's Differing Site Condition clause, FAR § 52.236-2.

The Secretary timely appealed the Board's decision. <u>See</u> 41 U.S.C. § 607(g)(1)(B) (2006). This court has jurisdiction under 28 U.S.C. § 1295(a)(10) (2006).

ANALYSIS

The Navy appeals the Board's equitable adjustment of the contract price with respect to claims 2, 7, 8, 13, 17, 26/32, 33, and 37.[2] To demonstrate entitlement to an equitable adjustment, Cath must prove that the contract was modified by someone with actual authority. Where a party contracts with the government, apparent authority of the government's agent to modify the contract is not sufficient; an agent must have actual authority to bind the government. <u>See</u> <u>Trauma Serv. Group v. United States</u>, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Such actual authority may be express or implied from the authority granted to that agent. We must determine whether Meland had express or implied authority to bind the government to contract modifications he approved, or whether these changes were ratified by the CO.

---

[2] The Navy also appeals the Board's conclusion that Cath is entitled to an equitable adjustment with respect to claim 3. Because the Board's rationale on that claim is different than the remaining claims, we separately address claim 3.

## I. Express Authority

With respect to contracts for supplies and services, the federal government has given the authority to enter into and modify contracts to only a limited class of government employees: contracting officers. See 48 C.F.R. § 1.601(a) (vesting agency heads with authority to contract for supplies and services and mandating that "[c]ontracts may be entered into and signed on behalf of the Government only by contracting officers"); 48 C.F.R. § 43.102 ("Only contracting officers acting within the scope of their authority are empowered to execute contract modifications on behalf of the Government."). In addition to possessing authority to enter into a contract on behalf of the government, contracting officers have the authority to, among other things, administer the contract and ensure the contractor's compliance with the contract terms. See 48 C.F.R. §§ 1.602-1, -2.

When authorized, the contracting officer may delegate some of its authority to certain designated representatives, who act on behalf of the government during contract administration. See John Cibinic, Jr., Ralph C. Nash, Jr., & James F. Nagle, Administration of Government Contracts 39 (4th ed. 2006). In this case, a limited delegation of authority occurred. The contract entered into by the Navy and Cath contains a clause that states that the contracting officer may designate a "contracting officer's representative (COR)" to perform "specific technical or administrative functions." See 48 C.F.R. § 252.201-7000. It also contains a clause entitled "GOVERNMENT REPRESENTATIVES (JUN 1994)," which states that "[t]he contract will be administered by an authorized representative of the Contracting Officer." That clause goes on to state that "the project Engineer In Charge" is an "authorized representative of the Contracting Officer" and "is responsible for monitoring

performance and the technical management of the effort required hereunder, and should be contacted regarding questions or problems of a technical nature."

It is very clear, however, that the contracting officer's limited delegation of authority to the EIC did not include the authority to make contract modifications, nor could it have. For one thing, such a delegation was prohibited by a Department of Defense regulation, which states that "[a] contracting officer's representative (COR) . . . [m]ay not be delegated authority to make any commitments or changes that affect price, quality, quantity, delivery, or other terms and conditions of the contract." 48 C.F.R. § 201.602-2 (1998).[3] Indeed, this express limitation on the COR's authority was incorporated into a clause of the contract itself, which, likewise, states that "[t]he COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract." See 48 C.F.R. § 252.201-7000.

Moreover two other clauses in the contract made it clear to Cath that the contracting officer was the only person with the authority to make changes to the contract. The same clause that designates the EIC as an authorized representative of the contracting officer provides that:

> [i]n no event, however, will any understanding or agreement, modification, change order, or other matter deviating from the terms of the contract between the contractor and any person other than the Contracting Officer be effective or binding upon the Government, unless formalized by proper contractual documents executed by the Contracting Officer prior to completion of this contract.

---

[3]  A more recent version of this regulation similarly states that "[a] COR . . . [h]as no authority to make any commitments or changes that affect price, quality, quantity, delivery, or other terms and conditions of the contract." 48 C.F.R. § 602-2(2) (2006).

And yet another clause of the contract, entitled "CONTRACTING OFFICER AUTHORITY (JUN 1994)," states (emphasis added):

> In no event shall any understanding or agreement between the Contractor and any Government employee other than the Contracting Officer on any contract, modification, change order, letter or verbal direction to the Contractor be effective or binding upon the Government. All such actions must be formalized by a proper contractual document executed by an appointed Contracting Officer. <u>The Contractor is hereby put on notice that in the event a Government employee other than the Contracting Officer directs a change in the work to be performed or increases the scope of the work to be performed, it is the Contractor's responsibility to make inquiry of the Contracting Officer before making the deviation.</u> Payments will not be made without being authorized by an appointed Contracting Officer with the legal authority to bind the Government.

The contract is clear, only the CO had the authority to make modifications. Meland did not have the express authority to bind the government to contract modifications.

## II. Implied Authority

The issue of implied authority is a much closer case. The government is not without blame for the confusion surrounding the contract in this case. For example, the contract required the CO to attend the preconstruction conference during which the Navy explained contract administration procedures. The CO did not attend. At that meeting the Navy presentation included a slide that stated

> Contract Modifications
>
> Modifications are <u>written</u> alterations to the contract which may change the work to be performed and/or the contract price and time. Oral modifications <u>will not</u> be used.
>
> - Bilateral modification—the contractor and the ROICC have agreed upon an adjustment to the contract
>
> - Unilateral modification—the ROICC can direct the contractor to take some action under the contract

No work is to be performed beyond the contract requirements without written notification from the ROICC.[4]

Cath dutifully complied with the Navy's directions for day-to-day contract administration presented in the preconstruction conference through the entire process. The problem is that these Navy directives contradicted the clear language of the contract and it is the contract which governs. The law and the unambiguous contract terms compel the result that we reach.

Authority to bind the government may be implied when it is an integral part of the duties assigned to the particular government employee. See H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) (internal citations omitted). In Landau, we held that a government employee possessing both the authority to ensure that a contractor acquired the raw materials needed to fulfill a contract and the authority to draw checks on the government bank account may have also had the "implicit authority" to guarantee payment to the contractor's supplier of raw materials. Id. Landau, however, is inapposite to this case. Here, the ROICC could not have had the implicit authority to authorize contract modifications because the contract language and the government regulation it incorporates by reference explicitly state that only the contracting officer had the authority to modify the contract. Modifying the contract could not be "considered to be an integral part of [the ROICC project manager's] duties" when the contract explicitly and exclusively assigns this duty to the CO. Id. We cannot conclude that Meland had implied authority to direct changes in the contract in contravention of the unambiguous contract language.

---

[4] It further defined modifications as changes in work, time extensions for certain delays, reimbursement for work suspension, and differing site conditions. These are exactly the types of modifications that were approved by Meland.

### III. Ratification

Cath argues that even if Meland did not have actual authority to bind the Navy to contract modifications, the changes directed by Meland were ultimately ratified and were therefore binding. Specifically, Cath argues that the July 27, 2001 Decision on Cath's certified claims, which was issued by the Head of the Contracting Office, reflects the fact that a person with actual authority and sufficient knowledge of the material facts endorsed the actions of Meland and found entitlement for Cath with respect to claims 3, 7, 10, 14, 15, 29, 30, 31, 33, 35, 36, and 37 (only claims 3, 7, 33, and 37 are before this court on appeal). The Navy argues that the CO's July 27 Decision did not amount to ratification because it was not made with full knowledge of the material facts and because it was not a final decision by the CO. The Board did not address ratification since it found that Meland had actual authority to order contract modifications.

Ratification requires knowledge of material facts involving the unauthorized act and approval of the activity by one with authority. Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1433-34 (Fed. Cir. 1998). Whether a contract has been ratified involves questions of fact, which has not been addressed by the Board in the first instance. See United States v. Beebe, 180 U.S. 343, 354 (1901); Brainard v. Am. Skandia Life Assurance Corp., 432 F.3d 655, 661 (6th Cir. 2005). For example, the parties dispute whether the CO had full knowledge of all material facts at the time he issued the July 27, 2001 Final Decision finding entitlement. While it appears from the detailed fifteen-page decision that the CO did have full knowledge, the government contends he did not. Given the dispute over knowledge and the lack of Board findings on this point, we remand to the Board to consider this issue in the first instance.

The dissent raises two points as to why ratification has not occurred in this case,[5] neither of which was argued by the government. The dissent's points further reinforce that there are questions of fact that should be resolved by the fact finder in the first instance. First, the dissent suggests that the CO's July 27, 2001 Final Decision does not "demonstrate[] the CO's adoption of the Project Manager's unauthorized change orders." But the decision itself suggests otherwise. With respect to claims 7, 33, and 37, it appears that the July 27 Decision constitutes acceptance of Meland's actions and that Cath is entitled to an equitable adjustment.[6] The July 27 Decision states: "In conclusion, our analysis indicates that entitlement is due the contractor for items . . . 7 . . . 33 . . . and 37." The Decision left unsettled only the amount for each adjustment, which it returned "to the Resident Officer in Charge of Construction for negotiation of an equitable adjustment." The Board similarly viewed the July 27, 2001 Final Decision as a concession to entitlement and issued a Show Cause Order requesting the Navy to explain why entitlement should not be granted. In its May 6, 2003 Memorandum, the Board stated that the Final Decision "clearly concede[s] entitlement on these items, leaving only quantum to be resolved." Whether the statements in the July 27, 2001

---

[5]   The dissent raises a third point, arguing that we are not bound by the CO's determinations of entitlement. We agree. We are not suggesting that because the CO found entitlement in his July 27, 2001 letter that we are bound to agree. Rather we conclude that the CO's finding of entitlement may be a ratification of the ROICC's contract modification and as such would bind the government to this change.

[6]   With respect to claim 7, the Decision stated "Since the contract drawings did not indicate all the work that needed to be accomplished for this item, the Government agreed that this was a changed condition. . . . An equitable adjustment will be negotiated with the ROICC." With respect to claim 33, the Decision stated that "the Resident Office In Charge of Construction agreed that this is a changed condition. I believe some entitlement is due." With respect to claim 37, the CO stated "[t]he Resident Office In Charge of Construction agreed that there is some entitlement on this item. . . . I recommend further negotiations with the Resident Office In Charge of Construction to negotiate a fair and reasonable cost for this item".

Final Decision constitute approval of the contract modification made by the ROICC involves questions of fact, which we believe the Board ought to resolve in the first instance.

The dissent also suggests that the contract requires ratification to occur prior to the completion of the contract, another argument not raised by the government or addressed by either party. The provision cited by the dissent is the Government Representatives Clause and provides the means by which an authorized change can be made during performance of the contract. It does not address, much less preclude, the CO from ratifying an unauthorized change after completion. The dissent itself does not conclude, nor could it based on a dearth of fact finding on this point, that this clause definitively prohibits a finding of ratification in this case. See Dissenting Opinion, at 4 (stating "the alleged ratification does not appear to have met either of these requirements").

Given the detailed factual nature of the ratification determination, we remand to the Board to consider in the first instance whether the CO's July 27, 2001 Decision constitutes ratification of ROICC Meland's directed changes with respect to appealed claims 7, 33, and 37.[7]

## IV. Claim 3

The Board determined that Cath was entitled to equitable adjustment for claim 3 under the Differing Site Conditions clause of the contract since Cath had established the five elements of a type 1 differing site condition. The Board determined that the

---

[7] Although the July 27 Decision also found that Cath was entitled to an equitable adjustment for claim 3, we affirm the Board's decision with respect to claim 3 on other grounds. Thus, the Board need not consider on remand whether ratification occurred with respect to claim 3.

drawings plainly show EPDM roofing material and Cath's bid demonstrated reliance on the erroneous representations regarding the roofing material on the drawings by including $50,000 for EPDM.  The Board also took judicial notice of the fact that EPDM is materially different from bitumen or built-up roofing material, and noted that there was nothing in the contract documents that put Cath on notice that the roofing material was bitumen.  Finally, the Board found that Cath incurred additional costs of $15,297.  The Navy failed to raise any argument on appeal that the Board's factual findings with respect to claim 3 are fraudulent, arbitrary or capricious, or unsupported by substantial evidence.  See 41 U.S.C. § 609(b).  Thus, the Board's finding of entitlement under claim 3 is affirmed.

## CONCLUSION

For the foregoing reasons, the decision of the Board is

<u>AFFIRMED IN PART, REVERSED IN PART, AND VACATED AND REMANDED IN PART</u>.

## COSTS

Each party shall bear its own costs.

# United States Court of Appeals for the Federal Circuit

2006-1359

Donald C. Winter, SECRETARY OF THE NAVY,

Appellant,

v.

CATH-DR/BALTI JOINT VENTURE,

Appellee.

PROST, Circuit Judge, dissenting-in-part.

I join the majority opinion except for Part III of the Analysis section, from which I respectfully dissent. In Part III, the majority concludes that it is necessary to remand this case so that the Board can determine whether the Contracting Officer's ("CO's") July 27, 2001 decision letter amounted to a "ratification" of certain changes directed by the Project Manager. I do not think a remand is necessary, and would hold that the CO's July 27, 2001 decision letter does not constitute a ratification of the Project Manager's unauthorized change orders.

As the majority points out, the CO issued his July 27, 2001 decision letter over a year after Cath-Dr/Balti Joint Venture's ("Cath's") performance of the contract was complete and in response to Cath's certified claim for costs allegedly incurred performing thirty-seven tasks not required by the contract. In that letter, the CO denied most of Cath's claims, in almost all instances, because he found that the alleged "extra" work was, in fact, required by the contract. Because Cath had no basis to recover

additional compensation for work required by the contract, the CO determined that there was "no entitlement" for those claims and stated that his decision regarding those claims was final. For the remainder of the claims—including claims 7, 33, and 37—the CO recommended that Cath negotiate a settlement with the Resident Officer in Charge of Construction ("ROICC") and asked that Cath's "request for a final decision on these issues be held in abeyance subject to further discussions with the ROICC."

The majority now remands claims 7, 33, and 37 for the Board to determine whether the CO's July 27 decision letter constituted a "ratification" of the unauthorized orders of the Project Manager. But under these circumstances, I do not believe there are material factual disputes that require a remand. The only evidence of ratification pointed to by Cath is the CO's July 27 decision letter, the content of which is undisputed. And I think there are at least three reasons why that decision letter is insufficient to require the government to pay Cath for claims 7, 33, and 37.

First, I do not believe that the CO's decision letter demonstrates the CO's adoption of the Project Manager's unauthorized change orders. Instead, I view the decision letter as simply an attempt by the CO to settle those claims for which he believed that Cath performed work outside of the contract. See John Cibinic, Jr., Ralph C. Nash, Jr., & James F. Nagle, Administration of Government Contracts 1286-89 (4th ed. 2006) ("Negotiated settlements . . . frequently take place following assertion of the claim and prior to the formal rendering of a final decision."). Indeed, the CO's decision letter recommended further negotiations for all of the claims in which he found that additional work had been performed, regardless of whether that work had been ordered

by the Project Manager.[1] Thus, read in the context of the rest of the letter, the CO's decision to recommend further negotiations on claims 7, 33, and 37 represents, at most, his recognition that the work described in those claims fell outside of the contract. Accordingly, while Cath characterizes the CO's decision letter as either a knowing adoption of the Project Manager's unauthorized change orders or a conclusive determination by the CO that Cath should be paid for these claims, I do not believe either conclusion is warranted.

Second, while the CO may have initially thought that Cath was entitled to compensation for any additional work it performed, neither the Armed Services Board of Contract Appeals, nor this court, is bound by the legal determinations of the CO. And as the majority opinion points out, the changes directed by the Project Manager are not binding on the government because the Project Manager did not have the authority to direct compensable changes.

Third, the contract states that "[i]n no event . . . will any understanding or agreement, modification, change order, or other matter deviating from the terms of the contract between the contractor and any person other than the Contracting Officer be effective or binding on the Government, unless formalized by proper contractual documents executed by the Contracting Officer prior to completion of this contract." While this provision appears to contemplate that changes directed by an unauthorized government official may later be ratified by the CO and therefore become binding on the

---

[1] For example, the CO found that the tasks described in claims 30 and 31 fell outside of the contract and recommended further negotiations on these claims even though it appears that no government official ordered Cath to perform either of those tasks. See Cath-dr/Balti Joint Venture, ASBCA Nos. 53581, 54239, 05-2 BCA ¶ 33046, slip op. at 67-69 (Aug. 17, 2005).

government, this provision means that the government will only be bound by changes adopted by the CO prior to the completion of the contract and formalized in proper contractual documents. In this case, the alleged ratification does not appear to have met either of these requirements.[2]

For these reasons, I respectfully dissent.

---

[2] This is not to suggest that the government would not be bound by a settlement entered into after completion of the contract. The July 27 decision letter, however, does not settle Cath's claims—it merely recommends further negotiations.