# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Dyno Group, Inc. | ) ASBCA No. 59074 |
| | ) |
| Under Contract No. W912P4-11-C-0016 | ) |

APPEARANCE FOR THE APPELLANT:　　Edward Everett Vaill, Esq.
　　　　　　　　　　　　　　　　　　　　Malibu, CA

APPEARANCES FOR THE GOVERNMENT:　　Thomas H. Gourlay, Jr., Esq.
　　　　　　　　　　　　　　　　　　　　Engineer Chief Trial Attorney
　　　　　　　　　　　　　　　　　　　　Lauren M. Turner, Esq.
　　　　　　　　　　　　　　　　　　　　Assistant District Counsel
　　　　　　　　　　　　　　　　　　　　U.S. Army Engineer District, Buffalo

## OPINION BY ADMINISTRATIVE JUDGE MELNICK

The United States Corps of Engineers withheld liquidated damages due to the late completion of a contract by Dyno Group, Inc. (Dyno). Dyno challenged that assessment in a claim submitted to the contracting officer, which was denied. Dyno has now appealed and elected to proceed under the Board's Expedited Procedure (Rule 12.2).[1] The appeal is denied.

## FINDINGS OF FACT

1. On 22 September 2011, the United States Army Corps of Engineers awarded Contract No. W912P4-11-C-0016 to Dyno (R4, tab 5). The contract was for the removal and replacement of staircases inside the Mount Morris Dam in Mount Morris, New York. The Scope of Work contained a base bid item that required the removal and replacement of two sections of the south gallery staircase, and five additional optional items, designated A through E, for the removal and replacement of additional staircases and the replacement of stair landings. (*Id.* at 279) The contract was signed for Dyno by Christopher Wan, its president (*id.* at 257).

2. Part 1.3 of the section of the contract addressing procedures required Dyno to "complete the entire work ready for use not later than one-hundred eighty (180) calendar

---

[1] The Contract Disputes Act, 41 U.S.C. §§ 7101-7109, implemented by Board Rule 12.2, provides that this decision will have no value as precedent, and in the absence of fraud shall be final and conclusive and may not be appealed or set aside.

days from the date of receipt by the Contractor of the Notice to Proceed." It added that "[f]or each Option awarded, the Contractor will be given an additional one hundred fifty (150) days to complete that option." It noted that "**[o]ptions may be awarded at any time within one year of original contract award and options may be awarded concurrently.**" (R4, tab 5 at 324)

3. The contract contained 13 contract line item numbers (CLINs). CLINs 1 through 3 were for the base work. The initial award also exercised Options C through E, reflected in CLINs 8 through 13. (R4, tab 5 at 259-64) The scheduled period of performance for CLINs 1 through 3 was 180 days, and for CLINs 8 through 13 it was 329 days (*id.* at 265-66).[2] The contract contained the FAR 52.211-12, LIQUIDATED DAMAGES—CONSTRUCTION (SEP 2000) clause. In the event Dyno failed to complete the work within the time specified in the contract, that clause required Dyno to pay $450 in liquidated damages to the government for each calendar day of delay until the work was completed or accepted. (*Id.* at 275) The contract also incorporated the FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) clause, and the FAR 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984) clause (*id.* at 268).

4. On 30 September 2011, after the contract was awarded, Mr. Wan sent an email to Brian Steils, the contracting officer representative (COR) (R4, tab 9; compl., tab 17, ¶ 4). The email asked whether "the completion timeframe for this job [was] 180 calendar days?" It noted the "[a]ward amount consists of Base bid and Options C, D, and E" and asked "do these options give more time for completion (ie does Dyno have 150 days x 3 = 450 additional days), or is it still 180 days?" (R4, tab 9) Mr. Steils's 3 October 2011 response referred Mr. Wan to an email from Mr. Walter Kamad from "Contracting." Mr. Kamad had advised the following:

> Just looked over the specs, base bid is 180 days. Since options C, D and E are awarded with base bid, the breakdown would be 180 for base bid and an additional 150 days for the options. The NTP would read 180 days for base bid and to complete all options in 330 days[.]

(R4, tab 10) Mr. Steils commented that "[t]he contract states 330 days, however USACE would expect Dyno group to complete the project as soon as possible" (*id.*). On 3 October 2011, the contracting officer issued a Notice to Proceed to Dyno, which Dyno acknowledged receiving that day, stating Dyno could commence performance on 4 October and had until 1 April 2012 (180 days) to complete the work (R4, tab 6).

---

[2] It is not clear why the scheduled period for CLINs 8 through 13 was not 330 days, as Part 1.3 suggests it should have been.

2

5. On 10 February 2012, the contracting officer sent Dyno a letter expressing concern about whether Dyno could complete the project by 31 March 2012. The letter noted there were still outstanding submittal issues requiring resolution before work could start on the site. The letter sought an updated schedule showing anticipated completion of deliverables and construction by 17 February 2012. (R4, tab 17)

6. On 16 February 2012, Dyno requested a 150-day extension of contract completion to 29 August 2012. Among other things, Dyno argued that the 1 April 2012 completion date in the Notice to Proceed was inconsistent with the contract, suggesting that the 180 days allotted only accounted for the base work, and added no time for the options. It claimed to be entitled to at least an additional 150 days. (R4, tab 19) On 5 April 2012, the contracting officer executed Modification No. P00001, effective 3 April 2012. The document purports to change the deadline for completion of each of the active CLINs to 2 July 2012.[3] This would add additional days to perform the base work contained in CLINs 1 through 3, while reducing the days permitted for Options C through E in CLINs 8 through 13. This document is not executed by Dyno. (R4, tab 24) However, Dyno concedes in its submittal that "[a]n extension of the contract was granted on April 3, 2012," citing an unexecuted document purporting to make the same changes in the performance periods contained in Modification No. P00001 (compl. at 6, tab 14).

7. On 28 June 2012, Mr. Wan and the contracting officer executed a bilateral modification to the contract, effective 25 June 2012. The modification exercised Options A and B, designated as CLINs 4 through 7, which involved additional removal and replacement of stairs. It designated the period for performing those CLINs to be from 26 June through 24 September 2012, which was 90 days. The modification also changed the deadline for completing the base work and Options C through E, CLINs 1 through 3 and 8 through 13, to 1 August 2012. (R4, tab 29)

8. On 26 July 2012, Dyno requested a 31-day extension of time to complete the base work, and Options C through E, from 1 August to 1 September 2012. Dyno provided two reasons for the request. First, Dyno stated that it had encountered uneven concrete pitch in the north stairs, requiring adjustment and adding additional labor and fabrication time. However, Dyno did not indicate that this added work had delayed completion of the job beyond the current deadline. The only item requiring additional time was installation of new fiberglass railings due to fabrication delays. (R4, tab 30) There is no record the request was acted upon by the government.

9. On 22 August 2012, the contracting officer sent another letter to Dyno, expressing concern about Dyno's timely completion of the contract work. The letter observed that the government had expected the base work to be completed by 1 August

---

[3] The first page of the modification purports to change each CLIN's deadline to 2 July, while the subsequent Summary Changes refer to 1 July.

3

2012, which had not occurred, and the remaining option work was to be completed by 24 September 2012. The government was concerned that Dyno's current progress was insufficient to enable it to comply with its deadline. The contracting officer warned that "further delays will increase our ability to assess liquidated damages." (R4, tab 32)

10. On 10 September 2012, Dyno requested an extension of the contract's completion deadline to 24 November 2012. Dyno provided six reasons for the extension. First, Dyno complained again about uneven concrete, indicating it had found more of it. Second, Dyno claimed it could only perform a limited amount of work at any one time to ensure that it was appropriately supervised and performed safely. Third, it claimed it was experiencing difficulty hiring qualified personnel. Fourth, it opined that the award of Options A and B entitled it to an additional 300 days. Fifth, it complained about the government's handling of its submittals. Sixth, it claimed to have encountered financial hardship. (R4, tab 34)

11. The project schedules Dyno submitted through 30 October 2012 showed completion by 19 or 20 November 2012 and closeout by the 23rd. They did not indicate the government was preventing completion. (R4, tabs 35, 36) On 19 November 2012, a government official commented in an email to Dyno that it appeared Dyno would not be complying with this schedule and sought an accurate submission. Dyno's response on the same day forecasted completion by 17 December and closeout by the 19th. Dyno added two comments. First, it said its receipt of material for the production of swing gates had been delayed because of Hurricane Sandy, but should arrive the first week of December for installation by the middle of the month. Second, Dyno claimed it was waiting for guidance on certain landings and approaches that it said the government wanted that were beyond the contract's scope of work. It emphasized that its new schedule was dependent on receiving an answer "ASAP." (R4, tab 37) With respect to the landings, an email dated 17 September 2012 from the COR informed Dyno that he "plan[ned] on sending...the RFP for the three top landings (modification) early this week" (compl., tab 11). Dyno submitted 55 quality control reports mentioning landings (compl. at 5; answer ¶ 16). Also, the first page of a five page Dyno quality control report from 14 November 2012 states that Dyno is "[w]aiting for direction on landings/approaches/top plates for all Staircases." It does not say that Dyno was prevented from performing any contract work until it received the direction. (Compl., tab 10)

12. In a letter dated 20 November 2012, the contracting officer once again expressed concern about Dyno's completion of the project by its latest suggested completion date of 19 December 2012. The letter acknowledged Dyno's representation that factory production of the swing gate material had been delayed due to Hurricane Sandy. It notified Dyno that any extension request for that purpose would have to show when the order was placed and that it was supposed to be delivered timely, along with a letter from the manufacturer confirming the delay. The contracting officer's letter also

4

referred to Dyno's inquiries about landing work outside the contract's scope. The contracting officer stated the government had not issued any requests for this work and Dyno should proceed without regard to those items. The contracting officer also informed Dyno that he would deduct $23,934.75 from Dyno's latest payment "in anticipation of assessing liquidated damages," observing that the contract's completion date was 24 September 2012. (R4, tab 38)

13. On 21 November 2012, Dyno formally requested an extension of the contract completion date to 19 December 2012. One of Dyno's cited reasons was the delay obtaining the swing gate material. It explained that it submitted its order for that material to the manufacturer in early October with the intent to receive it on site by the first week of November for fabrication and installation by 23 November. Dyno enclosed a letter from the manufacturer confirming the storm delays and predicting delivery of the materials by 30 November. Dyno also contended that it had been waiting for guidance on the landings and approaches since 2 August, and that the delay had prevented it from performing any work. Dyno also referred to the safety and financial hardship issues it had raised in its 10 September 2012 request for extension. (R4, tab 39) There is no evidence this request was acted upon.

14. On 13 February 2013, the contracting officer declared Dyno's work complete and accepted. The contracting officer considered the three-year warranty period to have commenced on 21 December 2012. (R4, tab 40) The government withheld $39,600 in liquidated damages (R4, tab 41). The amount reflects 88 days worth of damages, from 24 September 2012 until 21 December, at $450 a day.

15. On 3 April 2013, Dyno submitted a "Letter-Relief from Liquidated Damages" to the contracting officer, challenging the government's retention of liquidated damages (R4, tab 3). The contracting officer treated that letter as a claim. On 30 September 2013, he issued a final decision denying it. (R4, tab 2) Dyno filed a notice of appeal from that decision on 13 December 2013. Its cover letter with the notice elected to proceed under the SMALL CLAIMS (EXPEDITED) procedure referred to in Board Rule 12.1(a) and explained by Board Rule 12.2.

16. On 10 January 2014, the Board convened a conference call with counsel for the parties. During that call, the parties waived discovery and the government waived a hearing. Dyno represented that the packet of materials it submitted on 13 December 2013 was its substantive submission for the record. (Bd. mem. conf. call dtd. 15 January 2014) The government responded with an answer dated 23 January 2014. By letter dated 28 January 2014, Dyno notified the Board that it also waived a hearing. Dyno then filed a substantive reply to the government's answer dated 4 February 2014.

5

## DECISION

Dyno's primary argument is that, as originally awarded, the contract granted it 330 days to perform the base work and Options C through D. It claims that after Options A and B were exercised, it should have received at least an additional 150 days, making the contract completion date 26 January 2013. (Compl. at 1) It later contends that it should have received 150 days each for Options A and B, totaling 300 additional days (*id.* at 6). Still later in its reply submission, Dyno contends that it originally received 330 days to perform the contract. It was then granted an additional 90 days by the April modification and another 90 days by the June modification, totaling 510 days. (App. reply at 3[4]) It contends its 21 December 2012 completion of the contract was early under any of these scenarios and therefore no liquidated damages should have been assessed.

The contract's original terms provide 180 days from receipt of the Notice to Proceed to complete the base work, and grant 150 additional days for each option, which could be awarded concurrently (finding 2). On 3 October 2011, Dyno received the Notice to Proceed with its performance of the base work and Options C through E (finding 4). Thus, it had until 31 March 2012 to complete CLINs 1 through 3 relating to the base work.[5] It then had until 28 August 2012 to complete CLINs 8 through 13, relating to Options C through E. Modification No. P00001, which was not executed by Dyno, purports to change all of those deadlines to 2 July 2012, granting more time for the base work while reducing the time for Options C through E (finding 6). The subsequent 28 June 2012 bilateral modification is executed by both parties. It expressly provides that Dyno had until 1 August 2012 to complete both the base work and Options C through E. It then exercises Options A and B, designated as CLINs 4 through 7. However, instead of granting 150 days for Dyno to perform those CLINs, as originally permitted by the contract, it only permits Dyno 90 days, until 24 September 2012. Mr. Wan signed this modification and therefore agreed to its terms. (Finding 7) Dyno suggests that its agreement to this earlier deadline for Options A and B is invalid because it did not receive any consideration for the reduction (app. reply at 5). However, Dyno received an extension of its deadline for performing the base work. To the extent consideration was necessary to validate its acceptance of the reduced deadline for Options A and B, Dyno received it. Thus, after the 28 June 2012 modification was executed, Dyno had until 1 August to complete the base work and Options C through E, and until 24 September to complete Options A and B. Dyno has not demonstrated that it completed any of the required work prior to 21 December 2012.

Dyno presents several additional grounds for attacking the assessment of liquidated damages. First, it contends that uneven pitch in the concrete was not visible during its initial walk through and could not be seen until the stairs were removed. It

---

[4] The reply does not contain page numbers.

[5] The Notice to Proceed purports to permit Dyno until 1 April.

therefore claims it encountered an unforeseen site condition that caused delay in fabrication and installation. (Compl. at 4, tab 17, ¶ 7) Under the contract's incorporated Differing Site Conditions clause, Dyno could be entitled to an equitable adjustment to the contract in the event it encountered "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." FAR 52.236-2(a)(2). However, Dyno has done nothing more than assert that such conditions existed. Dyno has not shown that the uneven pitch could not be discovered from a reasonable site investigation. *See Huntington Constr., Inc.,* ASBCA No. 33526, 89-3 BCA ¶ 22,150 at 111,479. Nor has it shown that the condition would be unexpected to a reasonably prudent contractor. *Consolidated Constr., Inc.,* ASBCA No. 46498, 99-1 BCA ¶ 30,148 at 149,157, *aff'd,* 230 F.3d 1378 (Fed. Cir. 2000) (table). Finally, assuming uneven pitch constituted an unforeseen condition, Dyno has presented no evidence showing the number of days, if any, that condition delayed its completion of the work.

Dyno's second ground for attacking liquidated damages is that Hurricane Sandy's impact upon its swing gate material supplier during the week of 28 October 2012 constitutes an excusable delay. An excusable delay is "due to causes that are unforeseeable, beyond the contractor's control, and not resulting from its fault or negligence." *ECC, International,* ASBCA No. 55781, 13 BCA ¶ 35,207 at 172,744. "The delay must be to overall contract completion." *Id.* Dyno has demonstrated that its supplier was delayed due to Hurricane Sandy, but it has not shown that is the reason Dyno failed to comply with its 1 August and 24 September 2012 CLINs' deadlines. Indeed, Dyno's evidence shows that it did not order the materials from its supplier until early October 2012, after its contract deadlines had already expired (finding 13). Had Dyno timely performed, it would have ordered the materials and received them before Hurricane Sandy occurred. Accordingly, Dyno has failed to show that its supplier's Hurricane Sandy delays constitute an excusable delay.

Dyno also suggests that it encountered excusable delays because it had originally intended to use two work crews on each set of stairs. One would demolish the old stairs while a second would install the new stairs. It says it only discovered during performance that using two crews in the confined, inclined spaces containing the stairs was inefficient and unsafe because one crew would have to work above the other. Given that the contract's entire purpose was to work in these spaces, Dyno has not demonstrated why those safety and efficiency issues were unforeseeable.

Dyno also argues its delay is excused because the COR told it that additional work would be ordered by the government for the landings. Dyno says it could not perform until it received final guidance on that issue. It says it waited 110 days for that information, from 2 August 2012 until the contracting officer's 20 November letter stating no requests for additional work had been made. Assuming Dyno is correct, its

argument does not explain its failure to meet its 1 August 2012 deadline for the base work and Options C through E. Additionally, the COR is not authorized to make any commitments or changes affecting delivery or any other term or condition of the contract. *ECC, International,* 13 BCA ¶ 35,207 at 172,738 (quoting *Winter v. Cath-dr/Balti Joint Venture,* 497 F.3d 1339, 1344-45 (Fed. Cir. 2007)). Dyno bore the risk of its reliance upon any such representations. Furthermore, the evidence fails to support the contention that Dyno's performance was delayed for this reason. Dyno's 10 September 2012 request for a 61-day extension to 24 November 2012 fails to mention the matter (finding 10). Dyno's project schedules submitted through 30 October 2012 state that it would complete its work by 20 November, with no mention that the government was preventing completion (finding 11). Only on 19 November 2012, when it became clear that Dyno would not meet its self-imposed 23 November deadline, did it raise the landing issue as a possible excuse for its failure to timely perform (finding 11).[6] Dyno received the clarification it sought from the government the next day. Accordingly, Dyno has not demonstrated the landing issue excused its failure to timely complete the contract work.

Dyno also argues that the assessment of liquidated damages is invalid because the government suffered no real loss due to its late completion of the project. It also claims the contracting officer acted in bad faith, invoking the liquidated damages clause after the COR orally informed Dyno that its request for more time would be granted and that the contracting officer had to assess liquidated damages on the date they started accruing.

The contract's liquidated damages clause will be enforced unless the amount specified is "so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention or oppression." *DJ Mfg. Corp. v. United States,* 86 F.3d 1130, 1133 (Fed. Cir. 1996) (quoting *Wise v. United States,* 249 U.S. 361, 365 (1919)). The test is objective. A liquidated damages clause is valid as long as the stipulated amount is reasonable as of the time the agreement is made. *Id.* at 1137. Dyno bears the burden of proving the liquidated damages clause is unenforceable. *Id.* at 1134. In the absence of such proof, liquidated damages agreed to by competent persons freely, fairly, and understandingly will be enforced. *Id.* at 1133-34.

Dyno suggests that its late completion of the contract work caused no harm to the government. It claims the stairs are seldom used. To the extent they are used for tours there was no disruption, and the dam staff was not inconvenienced because an elevator was available to take them to the dam's various levels. However, the entire reason for the

---

[6] Although Dyno submitted 55 quality control reports mentioning landings, only the first page of a five-page report from 14 November 2012 is included in the record. That page says Dyno is "[w]aiting for direction on landings/approaches/top plates for all Staircases." It does not say that Dyno was prevented from performing any contract work until it received the direction. (Finding 11)

8

clause is to agree upon a fixed rate in the event of a breach to relieve the government of proving it suffered damages. 86 F.3d at 1134-35. Permitting Dyno to escape the clause's application by showing no damages were suffered in this particular instance would undermine that purpose. *Downing Electric, Inc.,* ASBCA No. 37851, 90-3 BCA ¶ 23,001 at 115,504 ("That no actual damages might have been suffered is not proof that the amount was unreasonable."). Additionally, Dyno's opinion as to the universe of potential costs the government might have suffered does not prove that the rate was unreasonable. An important component for determining liquidated damages rates in construction contracts is the additional cost to the government of inspection and supervision. FAR 11.502(b). Dyno has not shown that the $450 daily rate upon which it agreed has no relation to that cost. Moreover, Dyno's suggestion that the staff's access to an elevator proves they did not need stairs seems meritless on its face. Access to stairs is typically necessary for safety purposes, and that would seem to especially be the case inside a dam. At bottom, there is nothing inherently unreasonable about the $450 daily liquidated damages rate provided in this contract, and Dyno has failed to present any evidence proving it is. Accordingly, Dyno's attempt to invalidate the liquidated damages clause is rejected.

Dyno has also failed to prove its final point that the contracting officer acted in bad faith. It purports to support this contention by claiming the COR told it that its 10 September 2012 extension request would be granted, and that liquidated damages had to be assessed on the date they began accruing. Government officials are presumed to act in good faith and Dyno must overcome that presumption with clear and convincing evidence that the contracting officer did not act in good faith. *Croman Corp. v. United States,* 724 F.3d 1357, 1364 (Fed. Cir. 2013). As previously observed, the COR is not authorized to make any commitments or changes affecting any terms or conditions of the contract. *ECC, International,* 13 BCA ¶ 35,207 at 172,738. Thus, the COR's alleged representation that Dyno's extension request would be granted is not attributable to the contracting officer. Nor has Dyno cited any authority holding that the contracting officer waives the government's right to assess liquidated damages unless he does so on the date they begin accruing. Dyno has failed to show there was anything improper about the contracting officer's behavior here, and therefore its bad faith claim is rejected.

9

## CONCLUSION

For the reasons stated, the appeal is denied.

Dated:  11 April 2014

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59074, Appeal of Dyno Group, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
