# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| HTA Aviation, LLC | ) ASBCA Nos. 57891, 57892, 57893 |
| | )             57894, 58189, 58193 |
| | ) |
| Under Contract No. F34601-03-C-0394 | ) |

APPEARANCES FOR THE APPELLANT:       Gretchen A. Benolken, Esq.
                                                   Benolken & Everett, P.C.
                                                   Denton, TX

                                                   Kathy C. Weinberg, Esq.
                                                   Jenner & Block LLP
                                                 Washington, DC

APPEARANCES FOR THE GOVERNMENT:    COL Jennifer L. Martin, USAF
                                                   Air Force Chief Trial Attorney
                                                   Gregory Harding, Esq.
                                                 Anna C. Kurz, Esq.
                                                 Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE PAGE
## ON THE GOVERNMENT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

The government moves for partial summary judgment in these appeals, asserting that the contractor claims unauthorized costs of upgrading aircraft parts in accordance with original equipment manufacturer (OEM) service bulletins (SBs) in violation of unambiguous contract provisions requiring prior government approval for "over and above" (O&A) work (ASBCA Nos. 57891-94 and 58189). It also seeks summary judgment in ASBCA No. 58193, contending it has agreed to pay the claim and thus no issue is before the Board. Appeals before the Board correspond to HTA's numbered O&A requests as follows: ASBCA No. 57891, O&A No. 09-088; ASBCA No. 57892, O&A No. 10-037; ASBCA No. 57893, O&A No. 11-004; ASBCA No. 57894, O&A No. 11-1005; ASBCA No. 58189, O&A No. 10-032; and ASBCA No. 58193, O&A No. 11-044. The parties fully briefed the motions.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTIONS

*The Contract*

1. On 12 September 2003, the Department of the Air Force, Tinker Air Force Base Oklahoma (AF or government) and HTA Aviation, LLC (HTA), a small business, entered into Contract No. F34601-03-C-0394 for logistics support for C-38 aircraft stationed at Joint Base Andrews, Maryland. The contract contained firm fixed-price contract line item numbers (CLINs). (R4, tab 1 at 1-33) Among these is CLIN 0008 Flying Hour Fixed Price, which stated a range of fixed prices per flying hour depending upon the time required to perform the work and required HTA to "support the aircraft, subsystems and support equipment" in accordance with "paragraph 3.1 of the CSOW [Contractor Statement of Work]" (*id.* at 5).

2. The CSOW (R4, tab 1 at 39-65) states at ¶ 3.0, Requirements, that HTA, in addition to meeting contract administration requirements, "will support the aircraft, aircraft subsystems and support equipment by providing all spares, repair of recoverables, replenishment of expendables and consumables, replenishment of expendable materials and parts required to maintain Contractor-provided support equipment, repair and calibration of support equipment, replenishment of bench stock, and all associated transportation and material handling." The CSOW also calls for HTA to "provide for additional support as over and above tasks, aircraft paint and engine overhaul, technical/engineering support and investigations, field team support, aircraft maintenance and inspection; aircraft and component modifications, and aircraft crash investigation and damage repair." (*Id.* at 47-48)

3. CSOW ¶ 3.1, Flying Hours, provides:

> HTA will support the aircraft, aircraft subsystems and support equipment by providing all spares, repair of recoverables, replenishment of expendables and consumables, replenishment of expendable materials and parts required to maintain Contractor-provided support equipment, repair and calibration of support equipment, replenishment of bench stock, and all associated transportation and material handling. The average flying hour rate is estimated at 55 hours per month per aircraft.

(R4, tab 1 at 48)

2

4. CSOW ¶ 3.6.3, COMBS (Contractor Owned and Maintained Base Supply), provides:

> HTA will be responsible for all operations to include labor, materials, office supplies and equipment and overhead costs necessary to operate and maintain the COMBS. HTA will include COMBS operations and management in the overall Management Plan to be provided with the proposal. HTA will provide all spares, repair parts, which includes time-change items, bench stock consumables, pharmacy items, special tools and support equipment to support the missions of the C-38 aircraft. HTA will ensure all spares and parts issued have the appropriate FAA [Federal Aviation Administration] certification. HTA will ensure repair and overhaul of all reparable items are accomplished at FAA certified repair stations.... HTA will identify any inadequacies or non-availability of items required from the COMBS; provide a recommended plan for obtaining those items.

(R4, tab 1 at 50)

5. CSOW ¶ 3.6.7, Over and Above Work, states that "HTA will perform Over and Above work as negotiated with and directed by the" government's Administrative Contracting Officer (ACO) (R4, tab 1 at 52).

6. CSOW ¶ 3.6.7.4, Aircraft Modifications, states that "HTA will implement FAA Service Bulletins, Advisory Data, FAA Airworthiness Directives, Engineering Change Proposals (ECPs), TCTOs [Time Compliance Technical Orders], and other service actions <u>as approved by the program office and directed by the ACO</u>. HTA shall ensure these actions are performed at an FAA approved repair facility." (R4, tab 1 at 54) (Underlining added)

7. Standard government contract clauses incorporated by reference include DFAR 252.243-7002, REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998) (10 U.S.C. 2410) (R4, tab 1 at 35); and DFAR 252.217-7028, OVER AND ABOVE WORK (DEC 1991) (IAW DFARS 217.7702) (*id.* at 37). The O&A work provision, which is referenced[1] multiple times in the contract, states:

---

[1] (*See, e.g,* R4, tab 1 at 6, 7, 11, 12, 15, 16, 19, 20, 23, 24, 28, 29, 32, 33, 37)

(a) *Definitions*.

As used in this clause –

(1) *Over and above work* means work discovered during the course of performing overhaul, maintenance, and repair efforts that is—

(i) Within the general scope of the contract;

(ii) Not covered by the line item(s) for the basic work under the contract; and

(iii) Necessary in order to satisfactorily complete the contract.

(2) *Work request* [WR] means a document prepared by the Contractor which describes over and above work being proposed.

(b) <u>The Contractor and Administrative Contracting Officer shall mutually agree to procedures for Government administration and Contractor performance of over and above work requests.</u> If the parties cannot agree upon the procedures, the Administrative Contracting Officer has the unilateral right to direct the over and above work procedures to be followed. These procedures shall, as a minimum, cover –

(1) The format, content, and submission of work requests by the Contractor. Work requests shall contain data on the type of discrepancy disclosed, the specific location of the discrepancy, and the estimated labor hours and material required to correct the discrepancy. <u>Data shall be sufficient to satisfy contract requirements and obtain the authorization of the Contracting Officer to perform the proposed work;</u>

(2) Government review, verification, and authorization of the work; and

(3) Proposal pricing, submission, negotiation, and definitization.

4

(c) Upon discovery of the need for over and above work, the Contractor shall prepare and furnish to the Government a work request in accordance with the agreed-to procedures.

(d) The Government shall –

(1) Promptly review the work request;

(2) Verify that the proposed work is required and not covered under the basic contract line item(s);

(3) Verify that the proposed corrective action is appropriate; and

(4) Authorize over and above work as necessary.

(e) The Contractor shall promptly submit to the Contracting Officer, a proposal for the over and above work. The Government and Contractor will then negotiate a settlement for the over and above work. Contract modifications will be executed to definitize all over and above work.

(f) Failure to agree on the price of over and above work shall be a dispute within the meaning of the Disputes clause of this contract. (Underlining added)

8. As contemplated by DFAR 252.217-7028, paragraph (b), the parties entered into a supplemental agreement entitled "OVER AND ABOVE PROCESS CONTRACT: F34601-03-C-0394 Revision 3, 21 November 2006" (O&A process agreement). The stated purpose of this agreement was "to define the [contract's] Over & Above (O&A) process and to identify the specific tasks that must be completed to ensure that the O & A work performed meets all contractual requirements." The O&A process agreement was signed by HTA, and the government's ACO and Procurement Contracting Officer (PCO). (R4, tab 3 at 7-9)

9. Section 1, COMBS, of the O&A process agreement sets forth the parties' agreed-upon procedures for HTA to be reimbursed for a WR to perform over and above work on COMBS:

(a.) The Contractor will include the following on all COMBS WR[s] which are not included in Flying Hours and are

5

related to, but not limited to, parts repaired and provided because of maintenance malpractice, lost and missing, parts damaged by bird strikes/lightning strikes, Service Bulletins/TCTOs, field team, etc:

    (1)  Contract number
    (2)  Contract Line Item Number (CLIN) under which work is proposed
    (3)  Sequential work request numbering
    (4)  The aircraft registration number and the Contractor's assigned WR number
    (5)  The location of the C-38 aircraft
    (6)  A statement identifying the proposed work and an "initial estimate" of cost

(b.)  The contractor shall furnish the above information on a WR to the authorized Government Representative at the 201st ANG [Army National Guard]. The Contractor shall also verify that there are sufficient funds available for required expenditures. The 201st ANG will verify the accuracy of the work request and necessity of parts ordered or field support. The 201st representative will verify and sign WR and return to the Contractor. The Contractor will then commence work.

(c.)  Once the work is completed and a copy of the vendor's bill of materials, commercial invoice, and/or travel receipts with actual costs are received by the contractor, an updated, "final" WR is generated by the contractor and forwarded to the DCMA ACO, along with a Certificate of Conformance (with reviewer's signature and a listing of the applicable O&A worksheets) for the definitization process.

(d.)  The ACO will log the final WR in a WR control log. The ACO will verify and provide the following:

    (1)  WR information provided is complete
    (2)  201st ANG authorized representative has verified necessity
    (3)  If WR is acceptable, sign and return WR to the Contractor

> > (4) If WR is unacceptable, reject and return WR to the Contractor for correction.
> >
> > (5) The ACO shall record the WR status in the control log. If the WR is rejected, the reasons for that rejection will also be recorded.
>
> (e.) The ACO shall evaluate WR for price reasonableness.
>
> (f.) A bilateral contract modification (Standard Form 30) will be issued to definitize O & A work.
>
> (g.) The contractor may then bill for the definitized O & A work.
>
> (h.) The Contractor shall notify the Program Office once estimated expenditures reach 75% of the obligated amount on the O & A CLIN.
>
> ....
>
> 3. Disputes Process
>    (a.) If the ACO/PCO and Contractor reach an impasse, FAR Clause 52.212-4 (d), Contract Terms and Conditions-Commercial Items, cited in the contract will be used to resolve the disputes.

(R4, tab 3 at 7-9) (underlining added)

10. Pursuant to contract provision "Conformed Copy Thru P00028, CLIN 0013," "Over and Above costs shall include, but are not limited to, aircraft contingencies (i.e. bird strikes, lightening strikes, depot repair outside the capability of the Air Guard), maintenance, malpractice, field teams, additional meetings/conferences, government requested contractor travel, etc." (1st app. opp'n, ex. D[2]).

---

[2] We follow the parties' convention of citing submissions in ASBCA Nos. 57891-94 as relating to the first (1st) government motions for partial summary judgment and to those pertaining to ASBCA Nos. 58189 and 58193 as referencing the second (2nd) government motions for partial summary judgment. All citations to motion submissions refer to those containing updated record references following the Board's 28 August 2013 Order.

11. Contract Modification No. A00030 dated 29 April 2007 definitized "Over and Above Consolidated work requests" Nos. 07-011 through 07-015, 07-018 through 07-020, and 07-022 through 07-026. Of these, O&A No. 07-023 in the amount of $534.05 was for work set forth in OEM Rockwell Collins SBs 28 and 30. (R4, tab 33 at 1-3)

12. An email sent on 7 August 2007 by Bill (Wilmot) Simpson, HTA's C-38 program manager, concerned a 2 August 2007 conference call in which he, the Air Force's program manager (AFPM) Joyce Hollier, and MSgt Kenneth Crowder, quality assurance inspector for the 201st ANG, participated. The email dealt with "Service Bulletins on part in for repairs 08-07-07." According to Mr. Simpson:

> Hello Joyce,
> Per our conversation on August 2, 2007 (conference call with MSG Kenny Crowder on Over and Above), it is understood and agreed that when a required Service Bulletin is accomplished on a part that was sent in for vendor repair, and the vendor accomplishes the Service Bulletin in order to return the part to service, the Over and Above for the Service Bulletin will be initiated when that part is installed on the aircraft.
>
> However, if the part was tested and determined that no fault was found for removal and the required Service Bulletin was accomplished, the Over and Above for the Service Bulletin will be initiated upon return of the part to our COMBS.
>
> The 201st [ANG] may request the latest updated COMBS part for installation and remove the serviceable unit that does not have the Service Bulletin from the aircraft and return it to our COMBS.

(R4, tab 3 at 12-13) The record does not reflect, and the parties do not allege, that the government responded to Mr. Simpson's email.

13. The government's Contractor Performance Assessment Report (CPAR) for 1 October 2008—30 September 2009 told HTA that it "should ensure contractor-owned parts provided across counter through the requirements of this contract should be of the latest configuration" at "no cost to the Government" (underlining added). The CPAR cited HTA's 18 December 2008 O&A WR for an electronic flight display (EFD) "to be brought into compliance with a parts Service Bulletin (Rockwell Collins SB-31)." The

government questioned this request for payment, "as the contract does not cover the upgrade of contractor parts which includes associated SBs; however, the Government is only responsible for any SB accomplished on the aircraft. Upgrade of individual parts with vendor SBs continues to be in dispute since HTA is submitting over-and-aboves claims for this effort." (R4, tab 9 at 10-11)[3]

14. HTA took exception to the CPAR. It referenced the 21 November 2006 O&A process agreement, "written and approved by the Government, [which] lists SBs on COMBS parts as one of the items not covered by Flying Hours and explains the process by which an O&A should be submitted." HTA pointed out that the government had approved O&A WRs for SBs on a contractor-owned part in the past:

> It was not until HTA submitted an O&A for SB-31 (EFD 4077, S/N 1455) on 20 Jul 07, that the AFPM did not approve it, but after a meeting on 2 Aug 07 with the AFPM, 201st QAR and the HTA PM, the AFPM agreed to only approve O&As on SBs once a part was issued to the 201st [ANG]. The part was issued to the 201st [ANG] on 18 Sep 08 and per the AFPM[']s direction in the 2 Aug 07 meeting, O&A 09-088 was submitted for payment. O&A 09-009 for SB-31 (EFD-4077, S/N 1145) was also generated by HTA only to document that the SB was accomplished on the part and that the O&A would be reissued when the part is issued. To date, the AFPM has/will not approve any O&As pertaining to required SBs for contractor-owned parts. It is unclear why the Over and Above Process is not being followed.

(R4, tab 9 at 12)

15. The parties' continuing disagreement regarding HTA's requests for payment for Service Bulletin work as over & above the fixed-price contract requirements is reflected in the 1 October 2009-30 September 2010 CPAR (R4, tab 9 at 14-16). The government stated:

> An element of HTA[']s performance on this contract is to provide, across the counter, contractor-owned parts of the latest configuration. The Contractor is responsible to ensure this is done at no cost to the Government. The submission of

---

[3] Appellant objected to Rule 4, tab 9, pursuant to Board Rule 4(e). We do not herein weigh the evidence nor do we rule upon HTA's objection, but admit the document into the record for purposes of this motion as we are not convinced that HTA has met its burden under FED. R. CIV. P. 56(c)(2).

Over-and-Aboves for Service Bulletin (SB) accomplishment on parts continues to be an issue. The Contractor continues to try and charge the Government, through the Over-and-Above process, for the upgrade of individual contractor-owned parts with vendor SBs that the contract requires is the responsibility of the Contractor.

(*Id.* at 14) (Emphasis added)

16. HTA responded on 29 October 2010, disagreeing with the government's position that the SB work was the contractor's responsibility. It stated that:

HTA cannot find any listing or reference within the current contract where HTA is to provide the parts "of the latest configuration" as the [government's Assessing Official] has stated. In fact, CSOW 3.0, page 9 reads, "HTA will also provide for additional support as over and above tasks...aircraft and component modification." It is important to clarify that all of the Over-and-Aboves submitted for signature concern parts for which a SB was required to return the part/component to service and are currently installed on the C-38 aircraft and belong to the Government.

HTA reiterated that the O&A process agreement was written by the government and required the contractor to include information on all COMBS WRs for work "'not included in Flying Hours and [] related to, but not limited to, parts repaired and provided because of maintenance malpractice, lost and missing, parts damaged by bird strikes/lightning strikes, Service Bulletins/TCTOs, field team, etc...' Nowhere in this process does it exclude certain types of SB. The Government has in fact paid for a SB on a part/component that was repaired in the past." (R4, tab 9 at 15-16) (Ellipses in original)

17. HTA reminded the government that it had approved O&A No. 07-023, contending that the government "only pays for the SB costs while HTA paid for any repairs" and that it had not included the costs of SB work within CLIN 1008 for "parts/components installed on the aircraft [that] were unknown at the time of submitting HTA's proposal." The contractor noted that after O&A No. 07-023 was approved, the AFPM contacted HTA and "requested that any future O&As concerning SBs on parts/components not be submitted until the actual part/component was installed on the aircraft (once the part is installed it is owned by the government) to which HTA concurred." HTA said that, during the teleconference of 7 August 2007 with "the AFPM, 201st QAR and HTA's PM, the AFPM again agreed that an O&A would be submitted for payment when the part/component having the required SB was issued out of HTA's COMBS and installed on the aircraft. HTA's PM sent out the minutes to this meeting to all attendees and received no comments or corrections." (R4, tab 9 at 15-16)

10

18. By correspondence dated 30 June 2011, HTA submitted to the government "Contract Disputes Act Claim[s] under Contract Number F34601-03-C-0394 for Disputed Items of Over & Above Work" (R4, tab 3). Each claim is separately analyzed in HTA's "Discussion of Claims, Entitlement, and Quantum." HTA advised that, unlike Contract No. FA8106-09-R-0010, entered into by the government with a different contractor, the instant contract did not require HTA to "[p]rovide all spares and parts in the latest configuration that is approved for use on the current configuration of the C-38 aircraft, to include all required Service Actions including appropriate FAA certifications." The contractor maintains that "at no time during" the subject contract did the government "request a modification to our contract to have the same wording and/or intent as the new contract concerning this subject." (*Id.* at 2)

19. As part of its claim, HTA cited two documents in support of its position that it is entitled to compensation for its efforts. It relied upon CSOW ¶ 3.0, Requirements, which HTA explained "was written by HTA with the understanding that the Government via the Over and Above CLIN XX13 would be responsible for any component modification including Service Actions and Service Bulletins (SB) accomplished on any component or part." Next, HTA cited the parties' 21 November 2006 O&A process agreement, and pointed out that § 1.(a.) of that document "includes a list of items not included in flying hours which are subject to the O&A Process (reference, parts relating to Service Bulletins)." (R4, tab 3 at 1)

20. HTA explained that "O&A numbers 09-088, 10-037, 11-004 and 11-005 involve parts for which component modifications/Service Bulletins were required on the part to return the part to service and install on the C-38 aircraft. These parts were sent out for repair and determined to require modification/service bulletin [work] before installation onto the aircraft." (R4, tab 3 at 1) The claim provided details on each O&A WR (*id.* at 1-5), as follows.[4]

---

[4] The relevant appeal number for each claim has been added for ready reference.

*ASBCA No. 57891 - HTA's Over and Above Request No. 09-088 for Service Bulletin Work on the High Voltage Power Supply of an EFD*

21. In O&A No. 09-088, HTA sought $10,736 for its repair of the EFD (R4, tab 3 at 2-3, 16-19).[5] HTA contended this work was called for by Rockwell Collins SB 31, and was necessary before the manufacturer would "recertify [the] unit sent in for repairs" (*id.* at 18). HTA explained that when this SB work on the EFD was done in June 2007, "in-house O&A 07-034 was created and cancelled for documentation purposes only." The documentation was "updated when [the] part was issued" to the 201st ANG on 17 September 2008 "and installed on aircraft 94-1569 on Spare Parts Issue Request (SPIR) 4529." HTA reminded the government that it had "rejected this O&A on September 24, 2010" and the government's QAR "denoted on O&A 09-088 that 'Service Bulletins accomplished on Contractor owned assets are not spelled out in [the] O&A Process, Rev. 3, Dated 21 Nov 06, para. 1A.'" (*Id.* at 2-3)

*ASBCA No. 57892 - HTA's Over and Above Request No. 10-037 for Service Bulletin Work on a Flight Control Computer (FCC)*

22. By O&A No. 10-037, HTA sought $382.59 as the cost of parts, G&A and margin for performing SB 43 work it says was required by Rockwell Collins for the repair and recertification of the FCC. According to HTA, the "part was repaired in June 2007" and subsequently "installed on aircraft 94-1570" in accordance with SPIR 5042. The government's QAR rejected this O&A WR on 19 October 2010 without stating a reason. (R4, tab 3 at 3, 20-22)

*ASBCA No. 57893 - HTA's Over and Above Request No. 11-004 for Service Bulletin Work on an EFD*

23. HTA sought $12,722.36 in O&A No. 11-004 for work on an EFD done according to OEM Rockwell Collins SB 31. HTA attributed the necessity of this work to the OEM, alleging that this part "was repaired in December 2008 and Rockwell Collins SB 31 was accomplished to return [the] unit to service." HTA said that it had "created [an in-house O&A request] and cancelled for documentation purposes only and was to be updated when [the] part was issued to" the 201st ANG. It related that on "October 20, 2010, the Engine Flight Display was issued and installed on aircraft 94-1569 on Spare Parts Issue Request (SPIR) 5180." The $12,722.36 sought "represents the cost of the

---

[5] 1st gov't mot. at 5, ¶ 15. This paragraph of HTA's claim, which explains that the particular work required on the EFD dealt with the high voltage power supply, references Rule 4, tab 6 at 3, which the Board constructively removed from the record following appellant's objection pursuant to Board Rule 4(e). We do not rule upon the objection but admit the document into the record for purposes of this motion as we are not convinced that HTA has met its burden under FED. R. CIV. P. 56(c)(2).

12

part(s) to accomplish" SB 31 "only (no other repair or labor costs), and our G&A and margin." The government had rejected this O&A request on 3 November 2010, with the QAR noting that reimbursement for OEM SB work "accomplished on Contractor owned assets [is] not spelled out" in the O&A process agreement, and that the instant "contract does not provide a requirement for service bulletins [to be] complied with on contractor owned assets." (R4, tab 3 at 3, 25-28)

> *ASBCA No. 57894 - HTA's Over and Above Request No. 11-005 for Service Bulletin Work on Engine Display Unit (EDU)*

24. In O&A No. 11-005, HTA sought $40,650.81 to perform "Grimes Aerospace Service Bulletin 80-5125-31-0003 & 0004" for an EDU (R4, tab 3 at 4). Appellant asserts that these OEM SB repairs were done in August 2009 in order to return the unit to service. HTA noted that "no original replacement displays are available from the OEM" for this damaged display, and that it "would require a SB to install the later model of display on the EDU." The repaired EDU "was issued to the [201st ANG] and installed on 94-1569 on [SPIR] 5187." The government rejected the over and above request, "since both service bulletins were incorporated to return the unserviceable part to a serviceable condition, [and] it was not a valid O&A." (R4, tab 3 at 4, 28-38)

*The Contracting Officer's Final Decision (COFD) in ASBCA Nos. 57891, 57892, 57893 & 57894*

25. By COFD dated 12 September 2011, contracting officer (CO) Steven C. Kimbrell denied HTA's claims of 30 June 2011 for O&A WRs 09-088, 10-037, 11-004 and 11-005. The CO reasoned that the government had neither directed nor requested that any of the subject OEM SBs be performed on the contractor-owned spare parts, which were the contractor's responsibility until installed on the aircraft, and that the government did not specify how HTA was to manage parts or provide replacements. He denied the assertion that either the contract or the parties' O&A process agreement, without more, authorized HTA to be "automatically" paid for all SB work via the O&A process. The CO pointed out that the latter agreement specified the process whereby the contractor was required to obtain prior written verification from the appropriate government representative following submission of an O&A WR. The CO noted that the contract required only SBs issued pursuant to FAA-mandated TCTOs to be performed; as none of the claims involved such work, these O&A WRs were not compensable without previous government authorization that HTA failed to obtain. (R4, tab 4)

*HTA's Claims of 7 September 2011 Underlying ASBCA Nos. 58189 & 58193*

26. On 7 September 2011, HTA submitted claims for additional O&A work (R4, tab 13). Among other items, O&A No. 11-044 dated 16 March 2011 sought $3,227.61 for replacement of an oil pressure sensor for an "Aircraft 090's Engine Display System

(EDS)." The government had reported that the EDS was not indicating any oil pressure, and the "condition was only corrected following replacement of the Oil Temperature Transmitter." (*Id.* at 4-6, 38)

27. Also included in HTA's 7 September 2011 submission was O&A No. 10-032, which concerns a "Main Aircraft Battery" that was returned by the 201st ANG to HTA, which then set the battery to an FAA-approved repair shop for evaluation. Appellant seeks $2,594.71 for "the freight and labor of the servicing to comply with the Government's request to have the battery sent out for an evaluation to determine if they had contaminated the battery." (R4, tab 13 at 1-4, 11-20)

28. According to the contractor's claim, O&A No. 10-032 "involve[d] parts that the Government directed HTA to replace unnecessarily, which did not resolve the maintenance problem/issue and turned out not to be the cause of the problem/issue the Government had been experiencing." Appellant noted that "it is important to understand" that the 201st ANG Battery Shop was responsible for servicing and maintaining main aircraft batteries. It claims that "[j]ust prior to the events that gave rise to O&A 10-032, the 201st had returned an entire battery to HTA, claiming it was bad." HTA had the battery "tested by an FAA Repair Shop"; after it was "determined that the battery was not serviced properly by the 201st" and "only needed proper servicing to return it to service," the government "paid HTA for the cost of the testing and proper servicing of the battery under previous O&A 09-013." HTA says that similar circumstances arose again "Shortly following this event, [when] the 201st returned another entire battery to HTA, claiming it was bad." Once more, HTA sent the battery for testing at an FAA-approved shop, which concluded that the battery needed only proper servicing. As this particular "battery had already been replaced via exchange, it could not be returned, and, therefore, the Government paid HTA for the cost of the replacement battery under previous O&A 09-016." (R4, tab 13 at 1-3, 11-12)

29. According to appellant, the parties had dealt previously with and developed an approach for handling malfunctioning batteries that required only proper servicing and not replacement. The contractor contends that, to avoid the situation where the government paid "for an exchange replacement battery only to find out later that the returned battery only required proper servicing," three government "QAR representatives and HTA's Vice President [Brown] met the week of March 14, 2010." According to HTA:

> Chief Norvell requested that, from that point forward, HTA
> should send out any battery believed to be "bad" for testing
> first before replacing it with a new battery. If such a battery
> were sent out and determined to be bad, HTA would cover
> the evaluation costs and replacement costs; but if the battery
> was found to need only servicing, the Government would
> cover the cost of the evaluation and servicing (depot level

14

support) via an O&A, which would be a cost savings to the Government over replacing a battery that did not need to be replaced as had been the case with O&A 09-016.

(R4, tab 13 at 2-3)

30. HTA contends that it followed this process in March 2010 in handling a main aircraft battery from the 201st battery shop that the government believed had become contaminated. The contractor sent this battery to a certified repair station for evaluation, which HTA says disclosed "no contamination but did find evidence of leaking electrolyte and a corroded temperature sensor" which are "maintenance issues and should have been (but were not) previously detected and corrected" by the 201st ANG battery shop. Appellant seeks in O&A No. 10-032 to recover the cost of the "freight and labor" it expended to send the battery for evaluation, contending the deficiencies were due to the government's failure to properly maintain it. (R4, tab 13 at 2-3, 13-20)

*The Contracting Officer's Final Decision in ASBCA Nos. 58189 & 58193*

31. The COFD dated 28 March 2012 decided HTA's claims arising from a number of O&A requests including O&A Nos. 10-032 and 11-044 (R4, tab 14). The CO stated that "[t]he claim for $3,227.61 for O&A 11-044 is omitted from this discussion because the Government determined that this claim is acceptable and has agreed to pay $3,227.61 for this claim" (*id.* at 1). The record does not indicate, nor does the government allege, that HTA has been paid for O&A No. 11-044 despite the CO's agreement to do so.

32. The COFD also denied O&A No. 10-032, citing CSOW ¶¶ 3.0 and 3.6.3, which require HTA to support the C-38 aircraft. The government "believes that leaking electrolyte inside the battery is contamination, as this material is very corrosive and not normally leaked from a battery." The CO distinguished the two prior requests regarding malfunctioning batteries relied upon by HTA in which the government concurred with the repair or replacement of batteries, maintaining these "are entirely different from the finding in this case due to the battery contamination issue." (R4, tab 14)

DECISION

"Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Proveris Scientific Corp. v. InnovaSystems, Inc.*, 739 F.3d 1367, 1371 (Fed. Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); FED. R. CIV. P. 56(c). A successful movant "must show, based solely upon the record now before us and without benefit of a hearing that there is sufficient and uncontroverted evidence to meet its evidentiary obligation as defined by law and

15

precedent. Substantive law dictates the parties' relative burdens, and defines those 'material' facts that may affect the outcome of a particular cause of action." *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,512 (citing *Anderson v. Liberty Lobby*, 477 U.S. at 249-50).

*ASBCA Nos. 57891, 57892, 57893 & 57894*

The gravamen of the claims underlying ASBCA Nos. 57891 through 57894 are HTA's assertions that it is entitled to recover for executing particular OEM SBs because the contract calls for SBs to be performed as O&A work; it followed the direction of government officials by performing that work and then submitting its WRs after the parts were installed on the aircraft and costs were known; and the parties developed a course of performance evidencing the process change and waiving contract requirements for prior approval of O&A work. (1st app. opp'n at 1, 21-28)

The government moves for partial summary judgment in ASBCA Nos. 57891 through 57894, asserting that it is entitled to favorable judgment as a matter of law because these appeals involve purely legal issues and no material facts are disputed. It denies that the contract calls for HTA to perform OEM SB work, only FAA-directed SBs (TCTOs), and maintains that there is no written government authorization in the contract, O&A process agreement, or elsewhere, for HTA to perform the contested OEM SB work. According to the government, HTA was required to maintain an inventory of replacement parts, and any work performed on these contractor-owned items was to be done at HTA's initiative and expense. (1st gov't mot. at 1-6) It cites CSOW ¶ 3.6.7.4, which categorizes SBs as O&A work that requires prior approval by the ACO to be compensable, and the O&A process agreement, which calls for prior verification of the contractor's O&A WR by a representative of the 201st ANG before commencing performance. (*Id.* at 1-2, 8-10) The government "agrees with [appellant's] overall point that the Over and Above process that HTA exercised is not explicitly set forth in the contract or even the Over and Above Agreement." The "ACO did not sign off on O&As until an invoice was submitted for payment." The government describes giving prior assent for O&A WRs when these were "signed by the QAR or [AF]PM, who worked in concert with the PCO." Afterward, once O&A costs were known, "the ACO, who worked at DCMA in Dallas, TX, would review the charges before any monies were paid to HTA." (1st gov't reply at 1)

HTA opposes the motions, supporting its position with, *inter alia*, excerpted government responses to discovery requests, a declaration by HTA vice president Mr. William Brown, and the 7 August 2007 email from its employee Mr. Bill Simpson to AFPM Hollier regarding the 2 August 2007 call during which it maintains the government approved the work (1st app. opp'n, exhibits). Appellant argues that the OEM SB work in question was called for by the contract as O&A work but not included in the base, fixed-price per flying hour price. It notes that CSOW ¶ 3.6.7.4 refers to SBs and "other service actions" as O&A work that was not specifically known or specifically

contemplated when the contract was awarded. (*Id.* at 2-3, 12-13) HTA also relies on the 6 November 2006 O&A process agreement, which "specifically refers to 'Service Bulletins/TCTOs', and thus demonstrates that the Air Force desired that Service Bulletin work be accomplished" (*id.* at 23). Although HTA does not dispute that the contract and O&A process agreement call for the contractor to submit a WR to an authorized government representative for verification and signature before commencing work, it maintains that AFPM Hollier, MSgt Crowder's supervisor, "with the implied consent of the ACO and PCO" (*id.* at 3), verbally changed this process by telling the contractor to postpone submitting O&A WRs until after the part was installed on an aircraft and became government-owned property, and associated costs were known. HTA cites other occasions on which the parties adhered to this revised procedure, contending these and other instances show a course of performance modifying the contract and proving that the government waived prior submission and verification of its WR and before commencing O&A work. (*Id.* at 3-9)

The government's motions in ASBCA Nos. 57891 through 57894 are couched in terms of contract interpretation, which "is a question of law generally amenable to summary judgment." *The Public Warehousing Co.*, ASBCA No. 57510, 13 BCA ¶ 35,314 at 173,360 (citing *Varilease Technology Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002); *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed. Cir. 1998)). However, this generality does not apply here, as the government has not shown that these appeals are amenable to resolution by summary judgment on the basis of contract interpretation. Although HTA does not controvert the government's interpretation that the contract and O&A process agreement require prior approval of O&A WRs (1st app. opp'n at 3), and the government correctly observes that extrinsic evidence is not usually admitted where the contract is not ambiguous (1st gov't mot. at 11-12), the government failed to demonstrate the absence of disputed material facts, notably in regard to other legal theories raised by appellant that could affect a result dictated solely by the interpretation of contract terms.

Among other matters left unclear by the government, it does not rebut HTA's assertions that it was verbally directed by AFPM Hollier and MSgt Crowder, whom the government gave considerable power over WRs in the O&A process agreement, to postpone submission of O&A WRs until the work was complete and the parts became government property upon being installed on the aircraft. We are inadequately informed regarding the role played by the COs in administering the contract, especially the O&A process. Appellant buttressed its opposition to the motions in ASBCA Nos. 57891 through 57894 with the 10 May 2013 declaration of vice president William S. (Steve) Brown. The government did not proffer any affidavits or declarations from its personnel who were involved in the subject O&A WRs to contradict Mr. Brown's assertions. As all reasonable inferences must be drawn in favor of the nonmovant, *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987), we must credit Mr. Brown's testimony that government officials given a role by the O&A process agreement in handling

17

contractor O&A WRs provided direction with respect to submitting these requests; this is evidence of a disputed material fact. *See Jayco Int'l, LLC*, ASBCA No. 58461, slip op. at 12 (12 February 2014). The record is unclear regarding the contractual bases for the government's repeated admonishments to HTA that it was obligated to furnish items of "the latest configuration." Nor is there sufficient evidence to support the motions pertaining to the instances in which the government approved O&A WRs after the work was complete, which HTA asserts indicate a revised course of performance and the government's intent to waive the requirement of prior approval for this work. This list demonstrates the absence of "facts that might affect the outcome of the suit under the governing law" and thus "properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248. The government's motions for partial summary judgment in ASBCA Nos. 57891, 57892, 57893 and 57894 are denied.

*ASBCA No. 58189*

The government also premises its motion in ASBCA No. 58189 on contract interpretation. It alleges that HTA is not entitled to be compensated for work on the main aircraft battery because it is within contract requirements, and not O&A work. The government argues that HTA is obligated by CSOW ¶ 3.0, reiterated in ¶ 3.1, to "support the C-38 aircraft by making available all spares, repairs, and replenishments." It asserts that, in this case, "the main aircraft battery needed repair" because "an electrolyte had leaked and had corroded a temperature sensor." It asserts that appellant's "sole basis for its claim under O&A 10-032" is "an alleged oral agreement with Quality Assurance Representatives that the Government would cover the costs of evaluation and servicing if a battery did not need to be replaced entirely." The government contends that "this is contrary to the express language of the Contract, which required that HTA cover the costs of repairing and replacing parts"; that "extrinsic evidence cannot alter the terms of a contract"; and "QARs have no authority to change the terms of a contract." (2nd gov't mot. at 5-7) It points out that Chief Norvell was neither a QAR nor a CO (*id.* at 7), and "contests that there was any oral agreement and to the extent there was, it was not binding" (2nd gov't reply at 2).

HTA responds that summary judgment is inappropriate in ASBCA No. 58189 because "aircraft contingencies" and "maintenance malpractice" are included in contract "CLINs for Over and Above work" (2nd app. opp'n at 6-7). It cites two other instances of agreed-upon O&A work for which HTA was compensated, "in which a main aircraft battery had been reported by the 201st to be in need of repair or replacement but was later found to require only proper servicing to return it to proper operation" (*id.* at 7-8 (citing 2nd declaration of William S. (Steve) Brown)). Appellant cites the parties' "meeting the week of March 14, 2010" in which "Air Force and HTA representatives further agreed" that "if any such battery proved to indeed be 'bad,' HTA would pay the cost of evaluation and replacement, as such work would be covered by its fixed-price, repair/replacement obligation, but that if the battery proved to require only proper servicing to return it to

18

proper operation, the Air Force would pay for the evaluation, servicing, and related costs as over and above work." (*Id.* at 9) HTA notes that it "did not know when it received this main aircraft battery" that "the work would prove to be over and above *until after the work was done*," and that "advance approval was not possible or appropriate, and its absence cannot defeat HTA's claims" (*id.* at 15) (emphasis in original). Appellant takes exception to the government's argument that "it had no opportunity to approve this over and above work in advance" and that "the Air Force's approval of the previous over and above items for batteries that proved not to be bad waived any insistence on prior approval." Appellant criticizes the government's "argument about prior approval" as "ignor[ing] the Air Force's waiver, the parties' actual practice, and the parties' express agreement concerning batteries." HTA alternatively argues that, "if the work involved here cannot, for some reason, be treated as over and above work, then it should be deemed a constructive change to the Contract and compensated via the over and above process." (*Id.* at 14) (Citation omitted)

We deny the government's motion for partial summary judgment in ASBCA No. 58189, as it failed to establish the absence of disputed material facts. Although the government correctly cites *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339 (Fed. Cir. 2007) for the proposition that "[o]nly contracting officers have authority to enter into and modify contracts," and 48 C.F.R. § 43.102 *et al.*, which provides that other government personnel are not to "act in such a manner as to cause the contractor to believe that they have authority to bind the Government" (2nd gov't mot. at 7), these authorities are insufficient to warrant summary judgment in this case without additional undisputed facts. As noted in that portion of this decision pertaining to ASBCA Nos. 57891 through 57894, the manner in which the government administered this contract raises material issues and disputed facts not adequately addressed by the existing record. It is unclear what actions were taken by the PCO and ACO, or the extent to which these officials directed the contractor to act in accordance with other government employees, particularly the AFPM and QARs. Among other things, we note that the bilateral O&A process agreement gave power to the AFPM and QAR to allow HTA to commence work on O&A WRs and seek reimbursement from someone with CO authority later, a practice the government recognizes was followed by the parties. Once more, the government furnishes no evidence in the form of declarations, affidavits or other references to contradict Mr. Brown's second declaration.

We note further that the contract underlying the Court's decision in *Winter v. Cath-dr/Balti* allowed the CO to permit "the project Engineer In Charge [EIC]" to act as an "authorized representative of the Contracting Officer [COR]," but also stated that the COR "[m]ay not be delegated authority to make any commitments or changes that affect price, quality, quantity, delivery, or other terms and conditions of the contract." *Cath-dr/Balti*, 497 F.3d at 1345. The government has not shown how the instant contract characterized the role of the CO (including ACO and PCO), or how its written direction

that HTA commence O&A work upon the say-so of government employees lacking CO authority, are consonant with this holding.

*ASBCA No. 58193*

The government argues that summary judgment is appropriate for O&A No. 11-044 in ASBCA No. 58193, because "the Air Force has agreed to make payment on this claim and [with] nothing more remaining than to actually process the payment, the appeal is moot" and "there is no good reason for not dismissing" this appeal. The government relies upon *Chapman Law Firm Co. v. Greenleaf Construction Co.*, 490 F.3d 934, 940 (Fed. Cir. 2007) in support of its position. (2nd gov't reply at 9) HTA replies that it "has no desire to litigate this issue unnecessarily" and "will have no objection to dismissal" of ASBCA No. 58193 "when HTA has actually been paid for this item" (2nd app. opp'n at 15).

We grant the government's motion. This was a monetary claim; as the contracting officer's final decision determined that HTA was entitled to full payment, the claim is rendered moot. As we have stated:

> Where an appeal has been rendered moot by the
> contracting officer granting all of the relief requested in the
> claim on appeal, the Board should dismiss it with prejudice
> since there is no longer a dispute between the parties on the
> appealed claim.

*Lasmer Industries, Inc.,* ASBCA Nos. 56946, 56966, 11-1 BCA ¶ 34,671 at 170,801.

Because we are "required to assume that the Government [will] carry out the corrective action in good faith," *Chapman Law Firm,* 490 F.3d at 940 (citations omitted), we assume that the government will pay HTA the claimed amount plus accrued interest. Accordingly, ASBCA No. 58193 is dismissed, subject to reinstatement if the claim is not paid within a reasonable period.

20

## CONCLUSION

We have considered all arguments advanced by the parties. The government's motions for partial summary judgment in ASBCA Nos. 57891, 57892, 57893, 57894 and 58189 are denied. The government's motion is ASBCA No. 58193 is granted and the appeal dismissed as moot.

Dated: 27 March 2014

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57891, 57892, 57893, 57894 58189, 58193, Appeals of HTA Aviation, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

21