# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
 )
South Bay Boiler Repair, Inc. ) ASBCA No. 59281
 )
Under Contract No. N55236-09-D-0017 )

APPEARANCES FOR THE APPELLANT: Robert L. Kenny, Esq.
 Law Office of Robert L. Kenny
 San Diego, CA

 James A. Kelley, Esq.
 James A. Kelley & Associates
 Washington, DC

APPEARANCES FOR THE GOVERNMENT: Ronald J. Borro, Esq.
 Navy Chief Trial Attorney
 Ellen M. Evans, Esq.
 Senior Trial Attorney
 Rawn M. James, Esq.
 Matthew D. Bordelon, Esq.
 Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE WOODROW

### INTRODUCTION

The case involves an appeal from a contracting officer's final decision (COFD) denying the claim of appellant, South Bay Boiler Repair, Inc. (SBBR), for alleged constructive changes and delays. The claim arises under a delivery order (DO) issued by the Navy under a firm-fixed-price, indefinite-delivery/indefinite-quantity contract for boatyard services. The DO was for ship repair and preservation services, including the removal and application of paint and other coatings, on a small vessel identified as Landing Craft Utility (LCU) No. 1631. Appellant maintains that the ship repair contract failed to comply with 10 U.S.C. § 7311(a)(1) because it did not adequately identify "the types and amounts of hazardous wastes that are required to be removed by the contractor from the vessel."

The parties elected to proceed without an evidentiary hearing, via Board Rule 11, with each side relying upon the Rule 4 file and its supplements and submitting opening and reply briefs in accordance with an agreed-upon schedule. For the reasons set forth below, we conclude that the plain language of the ship repair contract – and

specifically the requirements of DO 0007 – satisfied the requirements of 10 U.S.C. § 7311 and placed appellant on notice of the presence of toxic heavy metals in the paint and coatings onboard LCU 1631. We deny the appeal.

FINDINGS OF FACT

I.    The Parties and the Contract

1. Appellant SBBR is a small business ship repair contractor located in National City, California (app. supp. R4, tab 94, Bowen decl. ¶ 1).

2. SBBR uses subcontractors to perform most of the preservation work required by a Navy ship repair contract. Preservation work involves removing existing coatings from the surfaces of the vessel and applying new coatings to the surfaces. Most preservation subcontractors use a sandblasting process to remove the majority of the existing coatings from the ship (app. supp. R4, tab 94, Bowen decl. ¶ 4).

3. On 3 June 2009, the Navy's Southwest Regional Maintenance Center in San Diego, California (SWRM or government), awarded a firm-fixed-price, indefinite-delivery/indefinite-quantity (IDIQ) Contract No. N55236-09-D-0017 for boatyard services to SBBR (the contract) (R4, tab 1 at 1-2 of 121).

4. On 6 September 2012, the government issued Request for Proposal (RFP) No. 0168 for work described in contract line item numbers (CLINs) 0067, 0082, 0083, 0087, and 0088 for LCU 1631 (R4, tab 21 at 1 of 7).

5. At CLIN 0067, the RFP states: "Firm-Fixed Price. Prepare for and accomplish Specification Package SSSD-504-12 for LCU 1631 [the specifications], attached." (R4, tab 21 at 1, 4)

6. While the RFP was pending, the government issued four pre-proposal amendments to RFP 0168 (R4, tabs 23-26).

7. Also while the RFP was pending, SBBR asked a question concerning the government's estimate of hazardous waste set forth in paragraph 3.5 of Work Item 077-01-001. SBBR asked:

> Since the requirements to accomplish removals differ
> greatly contractors utilize the government's quantities in
> generating their estimates of removal costs. If the amounts
> exceed the government's expectations and a mod is issued
> to cover the additional disposal costs it is the contractor's

. right to include additional expenses for labor, lab fees, analysis, etc. into the contract mod. Please advise.

(App. supp. R4, tab 78)

8. Amendment No. 1, dated 13 September 2012, contains, among other things, the government's response to the foregoing question posed by SBBR. Restated by the government, "QUESTION 1" reads as follows:

> ITEM NO. 077-01-001 (Hazardous Waste Produced on Naval Vessels): Hazardous waste item Para 4.1 states: "Hazardous waste generated during the actual performance of this work may vary in type and amount from waste listed in 3.5 which may result in renegotiation for credit or increase pursuant to paragraph (b) of 2.4."
>
> If the amount of hazardous waste exceeds the Government's expectations and a contract modification is issued to cover the additional disposal costs, is it the contractors right to include additional expenses for labor, lab fees, analysis, etc. into the contract modification?

(R4, tab 23 at 2 of 5) The Answer to Question 1 in the amendment states: "Yes, Government uses historical data to estimate and provide the amount of hazardous waste. Anything beyond the amount listed will be negotiated and addressed by a contract modification." (*Id.*) The historical data was based upon work on similar vessels, as verified by interviews with contractors and on a formula that uses surface area data to predict blast residue amounts (app. supp. R4, tab 98, King dep. at 46-47).

9. The government permitted contractors to take paint chip samples before submitting their proposals (app. supp. R4, tab 98, King dep. at 107-08).

10. SBBR's project manager, Donald Bowen, inspected LCU 1631 before SBBR submitted its proposal RFP. He did not take samples of the coatings on the vessel. (App. supp. R4, tab 143 at 1-2, 4)

11. Appellant admitted that it "based [its] hazardous paint removal costs on the small quantities of hazardous paint and paint chips [the government] included in Work Item 077-01-001" (app. br. at 108).

12. Appellant's estimator, Mr. Bowen, also acknowledges that mechanical cleaning processes (hammer, wire brush, needle guns) would produce paint chips as a

3

by-product, rather than spent abrasive material (app. supp. R4, tab 129, Bowen dep. at 70).

13. Mr. Bowen states that he was aware of the Navy's estimate of 275 tons of spent abrasive blast material contaminated with a known hazardous waste, but that he did not expect to generate that much because appellant's subcontractor, Pacific Yacht Refitters, Inc. (PYR), would be using a different process to remove the paint (app. supp. R4, tab 129, Bowen dep. at 63-64).

14. Mr. Bowen testified that, because PYR would be using steel grit, which could be recycled 300 – 500 times, the removal process would produce far less spent abrasive waste than the government's estimate of 275 tons (app. supp. R4, tab 129, Bowen dep. at 66-68).

15. Appellant understood PYR's estimate to include the cost of disposing of any spent abrasive material generated during the contract (app. supp. R4, tab 133, Wilkerson dep. at 21-29).

16. On 25 September 2012, SBBR submitted a proposal in response to RFP No. 0168 with a firm-fixed price of $2,492,859 for CLIN 0067 (plus $2,080 for CLINs 0082 and 0083) for the work outlined in Specification Packages SSD-504-12 for LCU 1631 (R4, tab 27 at 4-5).*

17. SBBR's proposal included a quote from its intended subcontractor, PYR, with $15,625.00 next to the description: "077-01-001 HAZARDOUS [WASTE] PRODUCED ON NAVAL VESSELS; CONTROL (SURFACE PREPARATION RELATED ONLY, DOES NOT INCLUDE LIQUID PAINT WASTE)" (R4, tab 27 at 24).

18. On 26 September 2012, the government accepted the proposal and awarded DO 0007 (consisting of CLINs 0067, 0082, and 0083) to SBBR in the amount of $2,494,939 (R4, tab 28).

19. There were 14 modifications to DO 0007: 13 bilateral modifications and 1 final, unilateral administrative modification (R4, tabs 29-42).

20. Three of the bilateral modifications provided time extensions, resulting in a final contract completion date of 25 October 2013 (R4, tabs 36, 39, 41).

---

* Several documents in the Rule 4 file contain more than one page number. We use the full number found at the middle of the bottom of the page.

21. During performance, appellant generated 44,185 lbs. of hazardous waste in 109 55-gallon drums (app. supp. R4, tab 67 at 31-37), an amount far less than the 275 tons estimated by the government.

## II.   Relevant Contract Provisions

22. The contract contained the standard Federal Acquisition Regulation (FAR) Changes clause, FAR 52.243-1, CHANGES – FIXED-PRICE (AUG 1987) – ALTERNATE II (APR 1984) (R4, tab 1 at 110 of 121).

23. The contract also contained Changes clause NAVSEA 5252.233-9103, DOCUMENTATION OF REQUESTS FOR EQUITABLE ADJUSTMENT (APR 1999), which provides, among other things, that a change includes "any act or omission to act on the part of the Government in respect of which a request is made for equitable adjustment" (R4, tab 1 at 102 of 121).

24. Section C.6.2.c of the contract sets forth specific environmental and safety requirements applicable to the contractor, including the following requirements relating to paints and coatings on the vessel:

> c. Consider all marine coatings to contain heavy metals (e.g. lead, cadmium or chromium), hexavalent chromium, crystalline silica and/or other toxic or hazardous substances as defined in 29 CFR 1815.1000. Contractor shall make an initial determination of potential employee exposure to toxic or hazardous substances prior to removal of existing non-skid or coatings. Laboratory analysis results of bulk non-skid/paint samples shall be submitted to the COR as soon as possible upon receipt from the laboratory.

(R4, tab 1 at 72 of 121)

25. The contract specifications contained six work items requiring appellant to remove existing coatings, prepare the craft's surfaces, and replace existing coatings as summarized below:

123-11-001   Fuel Oil Tank; Inspect;
123-14-001   Potable Water Tank; inspect and preserve;
123-16-001   Ballast Tank; repair and preserve;
631-11-001   Bilge; Preserve;
631-31-001   Steel Craft Preservation; accomplish; and

643-00-001  Interior Preservation; accomplish.

(R4, tab 27 at 8-12)

26. NAVSEA Standard Item 009-32, "Cleaning and Painting Requirements; accomplish," dated 31 January 2011 (R4, tab 22 at 6), requires a contractor to make an initial determination of potential employee exposure to hazardous levels of heavy metals before beginning paint removal, and then incorporate the appropriate level of worker and environmental protections based on that determination. The version of NAVSEA Standard Item 009-32 that was in effect at the time and incorporated into the contract provided in relevant part:

> 3.1.1 Consider marine paint/nonskid to contain heavy metals (e.g., lead, cadmium, or chromium), hexavalent chromium, crystalline silica and/or other toxic or hazardous substances.

> 3.1.2 Accomplish safety precautions as specified in 2.2, 2.3, and the Work Item/task order during surface preparation and the application or removal of marine paints.

(R4, tab 8 at 2 of 81)

27. Each work item specifically referenced Standard Item 009-32 and required the contractor to "accomplish the requirements of 009-32...for new and disturbed surfaces" (R4, tab 22 at 2-4, 6-11, tab 29, ¶ 3.4, tab 31, ¶ 3.10, tab 34, ¶ 3.9, tab 37, ¶ 3.11, tab 163, ¶ 3.6, tab 170, ¶ 3.30, tab 183, ¶ 3.6).

28. Standard Item 009-32 incorporates by reference the Occupational Safety and Health (OSHA) standards set forth at 29 C.F.R. 1915, Occupational Safety and Health Standards for Shipyard Employment, Subparts C and Z (R4, tab 8 at 1).

29. Work Item 077-01-001 sets forth the specific requirements for managing and disposing of hazardous waste generated in the preservation process:

> 3.    REQUIREMENTS:

> 3.1 Manage and dispose of all hazardous waste listed n 3.5 in accordance with 2.1 and 2.2.

> 3.1.1 When a Navy generator number is required by this Work Item, submit the original of 2.3 to

6

the SUPERVISOR for assignment of Environmental Protection Agency (EPA) or delegated state environmental agency identification number.

3.1.2 Manage and transport for Navy disposal, Navy-generated hazardous waste listed in 3.5 in accordance with 2.1 and 2.2, as designated by the SUPERVISOR.

3.1.2.1 Consider existing interior coatings to be removed by the invoking work items of this contract to contain lead, cadmium and chromium.

3.1.3 Submit one legible copy of 2.3 signed by the owner or operator of the disposal facility to the SUPERVISOR within 48 hours of receipt from owner or operator of disposal facility.

3.2 Complete documentation required by 2.1 and 2.2, using EPA or delegated state environmental agency identification number in accordance with 2.4.

3.2.1 Documentation related to hazardous waste generated solely by the physical actions of Ship's Force or Navy employees (termed Navy-Generated Hazardous Waste) on board the vessel shall only bear a generator identification number issued to the Navy pursuant to applicable law. The contractor shall obtain SUPERVISOR'S concurrence with the categorization of the waste as Navy-generated before completion of the manifest. The manifest prepared shall be presented to the SUPERVISOR for completion after the hazardous waste has been identified.

(R4, tab 22 at 16-17)

30. Work Item 077-01-001 describes the types of hazardous waste expected to be produced during performance:

3.5 Hazardous waste, as identified in 2.1, expected to be produced during performance of this Job Order.

....

7

Spent Abrasive Blast Material (contaminated with a known hazardous waste): 275 tons

....

Paints (May include lead, cadmium, or chrome): 10 pounds

....

Paint Chips: 20 pounds

(R4, tab 22 at 18-19)

31. Work Item 077-01-001 in the specifications provides the contractor with the following references, applicable to the contractor's performance:

2. REFERENCES:

2.1 Resource Conservation and Recovery Act (RCRA)

2.2 Federal Hazardous Materials Transportation Act, 49 U.S.C. [§] 5103

2.3 Applicable Hazardous Waste Manifest Form

2.4 10 U.S.C. [§] 7311

(R4, tab 22 at 16)

32. Chapter 631 of the *Preservation of Ships in Service* manual, expressly referenced in Standard Item 009-32, directs contractors to:

631-2.4.5.1.1 Assume paints being removed contain chromates and present an increased cancer risk unless it can be demonstrated either by laboratory analysis or survey of paint application logs or specifications that the existing paint does not contain chromates (as chromium) in excess of 50 parts per million (ppm) of 0.005 weight

percent total metal in the dry film. Multiple layers of paint must be individually verified as to their chromate content.

(R4, tab 9 at 87-88)

33. With respect to lead, the manual states that at paragraph 631-2.4.5.2.1: "Paint being removed shall be considered to contain lead unless the procedures of paragraph 631-2.4.5.1.1 are used to demonstrate the level of lead is below 0.005 weight percent in the dry film" (R4, tab 9 at 88).

34. With respect to cadmium, the manual states that:

> 631-2.4.5.3.1 Cadmium exposure may occur during the application or removal of coatings containing cadmium. In addition to its inclusion in paints, cadmium is frequently used for electroplating steel and aluminum parts. Therefore, precautions similar to those for lead and chromium removal should be taken when preparing surfaces of equipment which contain cadmium plated parts (e.g., fasteners, springs, electrical connectors, etc.).

(R4, tab 9 at 88)

35. In a series of modifications, the period of performance was extended until 25 October 2013 (finding 20).

### III. Nature of the Work

36. Marine coatings and industrial paints contain heavy metals and hazardous substances. Abrasive blasting to remove marine coatings produces airborne particles that can harm workers (app. supp. R4, tabs 115-16).

37. OSHA regulations apply to industrial processes, such as the removal of paint and other coatings that may expose workers to hazardous concentrations of certain heavy metals above levels specified in the OSHA regulations. The OSHA regulations that apply to ship repair operations are set forth in 29 C.F.R., Part 1915.

38. OSHA regulations set forth action levels and higher "permissible exposure limits" (PELs) for exposure for toxic heavy metals, including lead, cadmium, and hexavalent chromium (app. supp. R4, tab 93 at 7 (Expert Report of Kevin Malott)); see, e.g., 29 C.F.R. § 1915.1025, Lead in the Shipyard Industry; 29 C.F.R. § 1915.1027, Cadmium in the Shipyard Industry, and 29 C.F.R. § 1915.1026, Chromium (VI) in the Shipyard Industry.

9

39. When employee exposures exceed an action level for lead, cadmium or hexavalent chromium, OSHA regulations require an initial exposure determination, a medical surveillance program, periodic personal air sampling, and annual training on the hazards of lead exposure and the OSHA lead standard (app. supp. R4, tab 93 at 10).

40. The removal of paint containing toxic heavy metals in concentrations that result in exposure over the OSHA hazard levels requires more extensive worker safety requirements than the safety requirements necessary for the removal of paint that does not result in exposure over the OSHA hazard levels (app. supp. R4, tab 139, Greenfield dep. at 156-57).

## IV.    Requests for Equitable Adjustment

41. Appellant kept the government apprised of its paint sampling results with its periodic submission of Inspection Deficiency Reports (IDRs) (R4, tabs 58-62).

42. The government did not respond substantively to IDRs 74, 86 or 98 (R4, tabs 58-60), but directed appellant to continue with the work and suggested that appellant submit a formal REA for any additional costs to which it believed it was entitled (R4, tab 94 at 32).

43. The government maintained that the cost of removing paint containing heavy metals was covered by the terms of the contract and directed appellant to continue with the basic work items set forth in the contract (R4, tab 62).

44. On 16 July 2013, appellant submitted a request for equitable adjustment (REA), certified pursuant to DFARS 252.243-7002 in the amount of $361,604.00 for handling and disposal of excess hazardous wastes generated under this DO (R4, tab 52 at 1-5).

45. The majority of the specific costs sought in the REA, as set forth in the change order price analysis (COPA) attached to the REA, were for labor costs for work by appellant's subcontractor, PYR, associated with mitigating employee exposure to airborne contaminants during the paint removal process (R4, tab 52).

46. On 29 November 2013, appellant submitted an "amended REA/claim" for $947,811.00, which included $418,910.00 in costs relating to paint removal and $369,183 in delay and disruption costs and other direct costs. Appellant's submission contained a Contract Disputes Act certification pursuant to FAR 33.207(c), Contractor Certification.

10

47. On 31 January 2014, the government issued a COFD denying the claim. The COFD denied the claim on the primary grounds that: (1) the contract advised appellant to consider all marine coatings to contain heavy metals; (2) that the hazardous waste generated did not exceed the amount estimated in the 077 work item for disposal; and (3) that the government ultimately paid the costs for disposal of the hazardous waste, not SBBR or its subcontractor (R4, tab 54 at 1-5).

48. On 13 February 2014, appellant, through counsel, revised its claim downward to $819,128.00, stating that it had "removed or modified" elements of its claim after reviewing its direct and indirect costs in light of the comments contained in the COFD (R4, tab 55 at 10).

49. On 28 April 2014, SBBR appealed from the COFD and the Board docketed the appeal as ASBCA No. 59281. On 1 July 2014, SBBR filed its complaint. After conducting written discovery and taking depositions, the parties agreed to submit the appeal on the record pursuant to Board Rule 11.

## DISCUSSION

The central issue raised by appellant is whether the ship repair contract – and specifically the requirements of DO 0007 – satisfied the requirements of 10 U.S.C. § 7311. Section 7311 states, in relevant part:

> § 7311. Repair or maintenance of naval vessels: handling of hazardous waste
>
> (a) CONTRACTUAL PROVISIONS.—The Secretary of the Navy shall ensure that each contract entered into for work on a naval vessel (other than new construction) includes the following provisions:
>
> > (1) IDENTIFICATION OF HAZARDOUS WASTES.—A provision in which the Navy identifies the types and amounts of hazardous wastes that are required to be removed by the contractor from the vessel, or that are expected to be generated, during the performance of work under the contract, with such identification by the Navy to be in a form sufficient to enable the contractor to comply with Federal and State laws and regulations on the removal, handling, storage, transportation, or disposal of hazardous waste.

11

Appellant contends that the statute imposes a duty on the government to "positively identify and quantify the hazardous paint on the LCU 1631 in a manner that allowed the contractor to plan its compliance with OSHA and other regulations that apply when removing hazardous paint" (app. br. at 112). Appellant argues that the government's "reliance on standard contract work specifications telling the contractor to 'consider' all paint on the vessel to contain heavy metals" was insufficient to satisfy the government's disclosure obligations pursuant to 10 U.S.C. § 7311 (*id.* at 6).

Specifically, appellant contends that the government's reliance on Standard Item 009-32 – telling the contractor to "consider" all paint on the vessel is hazardous – violates 10 U.S.C. § 7311, because it fails to inform the contractor of the type and quantity of paint on the vessel that contained heavy metal contamination in excess of OSHA trigger levels (app. br. at 115). Moreover, Work Item 077-01-001 serves only to inform "the contractor that all paint removed from the vessel must be disposed of as hazardous waste" (*id.* at 111). It does not, according to appellant, identify and quantify the heavy metals in the existing paint "in a manner sufficient to enable [appellant] to comply with the worker safety and environmental protections [sic] regulations that apply to paint removal operations" (*id.* at 98). In particular, appellant contends that the word "consider" means only that the contractor should determine whether or not the paint might contain heavy metals, not that the contractor should assume that all of the vessel's paint contains heavy metals (*id.* at 106).

In appellant's view, because the Navy is in the best position to know what type of paint is present on its ships, 10 U.S.C. § 7311 imposes a duty on the Navy to identify and quantify the existing hazardous paint on the vessel in a way that permits the contractor to estimate the cost of the worker safety procedures required to remove the paint (app. br. at 105-06).

We first determine the scope of the duty imposed by 10 U.S.C. § 7311 and then determine whether the contract in this appeal satisfies that duty.

## A. Scope of Statutory Requirement Set Forth in 10 U.S.C. § 7311

The first step in statutory interpretation is to review the statutory language, which should be given its plain meaning absent clear indications to the contrary. *See Lynteq, Inc. v. United States*, 976 F.2d 693 (Fed. Cir. 1992); *EFG Associates, Inc.*, ASBCA No. 50546 *et al.*, 01-1 BCA ¶ 31,324. If the language is clear and fits the case, the plain meaning of the statute generally will be regarded as conclusive. *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed. Cir. 2004) (citations omitted).

10 U.S.C. § 7311(a)(1) requires the Navy to identify "the types and amounts of hazardous *wastes* that are required to be removed by the contractor from the vessel, or that are expected to be generated, during the performance of work under the contract" (emphasis added). By its terms, 10 U.S.C. § 7311 applies to both the generation of hazardous waste and the disposal of that waste.

The statutory language does not state that the Navy must quantify the "types and amounts" of *paint* containing hazardous substances, much less identify specific portions of the vessel where paint may contain hazardous substances. Instead, the statute focuses on the types and amounts of hazardous waste. While it may be true that identifying hazardous paint may shed light on the quantity of hazardous waste that is expected to be generated from removing that paint, the statute does not impose any specific method of identifying and quantifying the hazardous waste that is expected to be generated. Indeed, the government estimated the amount of abrasive blast residue based on the past history of similar vessels, as verified by interviews with contractors, and on a formula that uses surface area data to predict blast residue amounts (findings 8-9).

Section 7311 does not address worker safety requirements or the costs of paint removal. Instead, that cost is determined in the other parts of the contract pertaining to the specific removal work to be undertaken (finding 25). In our view, 10 U.S.C. § 7311 imposes on the Navy a duty to identify the type and quantity of hazardous waste that is expected to be generated. After that, the duty shifts to the contractor to properly price the activities involved in generating and disposing of that waste.

## B. Whether the Contract Satisfied the Requirements of 10 U.S.C. § 7311

Given this understanding of the scope of the statutory obligations of 10 U.S.C. § 7311, we next address whether the contract in this case satisfied those obligations. Again, we rely on the plain language of the contract's provisions. *LAI Services, Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009) (holding that contract interpretation begins with examination of the plain language of the written agreement). Contract language is clear and unambiguous when there is only one reasonable interpretation consistent with the plain meaning. *Id.*

In this case, two specific provisions of the contract, when considered together, satisfy the obligations of 10 U.S.C. § 7311. First, the contract contains specific estimates of hazardous waste set forth in paragraph 3.5 of Work Item 077-01-001, which states that the contractor would generate up to 275 tons of spent abrasive blast material, 10 lbs. of paint, and 20 lbs. of paint chips (finding 31). Second, the contract incorporates Standard Item 009-32, which expressly instructs the contractor to "[c]onsider existing interior coatings to be removed by the invoking work items of this contract to contain lead, cadmium and chromium" (finding 27). When these two

13

provisions are considered together, there is no ambiguity that the paint to be removed is likely to contain toxic heavy metals of lead, cadmium, and chromium. Given this unambiguous language, appellant should reasonably have concluded that removal of the paint would trigger worker safety requirements for the removal of toxic heavy metals.

Appellant attempts to inject ambiguity into the contract by challenging the common sense understanding of the word "consider" as it is used in Standard Item 009-32. In particular, appellant contends that the word "consider" means only that the contractor should determine whether or not the paint might contain heavy metals, not that the contractor should assume that *all* of the vessel's paint contains heavy metals (app. br. at 99-106).

In our view, there is no need to engage in a semantic debate regarding the meaning of the word "consider." The phrase "[c]onsider marine paint/nonskid to contain heavy metals" expressly places the contractor on notice that the vessel's coatings *may* contain heavy metals (finding 26). We do not need to decide whether "consider" means that the contractor automatically should assume *all* paints and coatings are contaminated with heavy metals. Because the contract places the contractor on notice that the vessel's coatings may contain heavy metals, it is incumbent on the contractor to estimate the cost of performance. The contractor can employ its own business judgment to decide how best to estimate the cost of performance, for example, by taking paint samples, by assuming that all of the vessel's coatings are contaminated with heavy metals, or by accepting the risk that removing the paint will not require costly worker protection requirements.

Instead of basing its estimate of removal costs on the quantity of abrasive blast material, appellant admits that it "based [its] hazardous paint removal costs on the small quantities of hazardous paint and paint chips [the government] included in Work Item 077-01-001" (finding 11). Appellant's estimator, Mr. Bowen, also acknowledges that mechanical cleaning processes (hammer, wire brush, needle guns) would produce paint chips as a by-product, rather than spent abrasive material (finding 13).

Appellant states that it generated 44,185 lbs. of hazardous waste in 109 55-gallon drums (finding 16), an amount far less than the 275 tons estimated by the government. Appellant attempts to justify its position by drawing a comparison between the 44,185 lbs. of hazardous waste that it generated to the government's estimate of 10 lbs. of paints and 20 lbs. of paint chips, rather than comparing its 44,185 lbs. to government's estimate of 275 tons of hazardous waste.

Appellant's estimator, Mr. Bowen, admits that he was aware of the Navy's estimate of 275 tons of spent abrasive blast material contaminated with a known hazardous waste, but that he did not expect to generate that much because PYR would

14

be using a different process to remove the paint (finding 14). He testified that, because PYR would be using steel grit, which could be recycled 300 – 500 times, the removal process would produce far less spent abrasive waste than the government's estimate of 275 tons (finding 14). According to Mr. Wilkerson, SBBR's general manager, appellant understood PYR's estimate to include the cost of disposing of any spent abrasive material generated during the contract (finding 15).

Appellant offers little explanation for why it did not base its hazardous paint removal costs on the government's estimate of 275 tons of "Spent Abrasive Blast Material (contaminated with a known hazardous waste)" (findings 14, 30). According to appellant, the government's estimate of 275 tons of blast residue was not specific enough for appellant to conclude that the blast residue would contain toxic heavy metals (lead, cadmium and chromium) as opposed to the less toxic contaminants of copper and zinc. Appellant explains that paragraph 3.5 of Work Item 077-01-001 "did not inform PYR that the paint it would blast off the surfaces of the ship contained concentrations of lead, cadmium or chromium that would require abatement [involving OSHA worker protections] during the removal process" (app. br. at 37). Apparently, this is because blast residue typically is "contaminated with copper and zinc," materials "often used in the anti-fouling coatings and epoxies used on Navy vessels" (id. at 36). Appellant maintains that copper and zinc make the blast residue hazardous for disposal purposes, but do not make it hazardous under the OSHA regulations (id. at 37). The government disagrees, contending that the minimum required worker protections are essentially identical for removing paint containing lead as for removing paint containing zinc (R4, tab 57 at 5). Regardless of whether this is true, it does not change the fact that appellant assumed that the bulk of the paint and coatings on board LCU 1631 would not require the same worker protection requirements as required for toxic heavy metals.

Appellant's explanation is particularly bewildering when both Section C.6.2.c of the contract and Standard Item 009-32 expressly instruct the contractor to "[c]onsider existing interior coatings to be removed by the invoking work items of this contract to contain lead, cadmium and chromium" (finding 27). In our view, the proper comparison is to the estimate of hazardous abrasive blast waste to be generated, not to specific quantities of paint chips or paint waste. This view is consistent with the statutory language. The fact that PYR would be using recyclable steel grit instead of sand might reduce the ultimate quantity of hazardous waste generated during paint removal, but should not change the need to provide for worker protection during paint removal.

Appellant's interpretation of the contract focuses on Standard Item 009-32 in isolation and fails to take into account how the provisions of Work Item 077-01-001 and Standard Item 009-32 work together. This violates the core principle of contract interpretation that contract terms are interpreted and read as a whole, giving reasonable

15

meaning to all of the contract's parts, and without leaving "a portion of the contract useless, inexplicable, void, or superfluous." *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

Moreover, appellant's position would shift the risk of estimating the cost of performance to the government, rather than to the contractor. In a firm-fixed-price contract, the risk of estimating the cost of performance falls squarely on the contractor and the contractor generally assumes the risk of unexpected costs. FAR 16.202-1, Description; *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014) (holding that "[t]he essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs"). In this case, the contract provisions unambiguously place the contractor on notice that paint removal may require worker safety precautions associated with the presence of heavy metals contamination.

### C. Distinguishing Metal Trades and Southwest Marine

Appellant relies on *Metal Trades, Inc. v. United States*, 810 F. Supp. 689 (D.S.C. 1992); and *Southwest Marine, Inc.*, ASBCA No. 46155, 96-2 BCA ¶ 28,292 to support its interpretation of 10 U.S.C. § 7311.

*Metal Trades* is inapposite. In *Metal Trades*, the court held that the government had violated § 7311 by failing to quantify the amount of hazardous asbestos waste expected to be generated during the ship repair contract. The court found unpersuasive the government's contention that a standard contract provision – providing that the contractor is to "consider" all insulation to be asbestos-based material – was sufficient to satisfy the duty established by § 7311. The court reasoned that knowledge of the existence of hazardous waste was not equivalent to knowledge of the amount of hazardous waste expected to be generated. 810 F. Supp. at 694.

In *Metal Trades*, the government made no effort to identify or quantify the asbestos in the job order. Here, in contrast, the government expressly quantified the type (spent abrasive blast material) and quantity (275 tons) of hazardous waste that it expected to be generated. Moreover, in this case, the government does not rely solely on a standard contract provision to comply with 10 U.S.C. § 7311. Instead, it relies on an estimate of the type and quantity of hazardous waste expected to be generated during paint removal, in combination with a specific warning that the paint to be removed should be considered to contain concentrations of specific toxic heavy metals. Appellant should reasonably have concluded that removal of the paint would trigger worker safety requirements for handling these toxic heavy metals.

Moreover, the court's holding in *Metal Trades* does not impose any specific method of identifying and quantifying the hazardous waste that is expected to be

16

generated – it merely holds that the government must quantify the type and amount of waste it expects to be generated.

Finally, the district court's holding in *Metal Trades* is not binding precedent on this Board. This Board does not consider a district court decision to be precedent "binding" on it if the decision was issued in an appeal other than one currently before the Board. *SWR, Inc.*, ASBCA No. 56708, 15-1 ¶ 35,832 at 175,219-21 (addressing precedential effect of federal district court decision reversing a Board decision arising from a maritime contract pursuant to 41 U.S.C. § 7102(d)); *see also Marine Logistics, Inc. v. England*, 265 F.3d 1322 (Fed. Cir. 2001) (holding that appeals arising out of maritime contracts must be brought in the federal district courts).

The Board's decision in *Southwest Marine* also fails to support appellant's position. *Southwest Marine* is factually similar to this case, in that it involves the application of 10 U.S.C. § 7311 to a ship repair contract. Like this case, the contractor contended that the Navy's reliance on a standard contract item failed to satisfy the requirement of 10 U.S.C. § 7311 to "identif[y] the types and amounts of hazardous wastes that are required to be removed by the contractor from the vessel."

These factual similarities, however, are not enough to support appellant's interpretation of 10 U.S.C. § 7311. The critical distinction between *Southwest Marine* and this appeal is that the contractor in *Southwest Marine* encountered a quantity of asbestos greatly in excess of the specific amount of the government's contractual estimate. In *Southwest Marine*, the contractor removed 166,210 lbs. of asbestos from the vessel, more than an order of magnitude greater than the government's estimate of 10,000 lbs.

Here, in contrast, appellant generated a much lower quantity of hazardous waste than the government's contractual estimate. Appellant claims to have been surprised by the level of effort required to remove the paint on board the vessel, not by the quantity of hazardous waste generated during the removal process. The contract in this appeal provided sufficient information for appellant to conclude that it would generate as much as 275 tons of hazardous waste during paint removal, and that removing the paint likely would require worker safety protections associated with the presence of toxic heavy metals.

### D.    Extrinsic Evidence Not Necessary

Appellant makes much of the fact that the Navy modified the language of Standard Item 009-32 in the year following appellant's contract (app. br. at 111 n.15). While it is true that the new language of Standard Item 009-32 adds clarity by instructing the contractor to "consider" "abrasive blasting media" to "contain heavy metals and/or other toxic or hazardous substances," the language of Standard Item

17

009-32 that was included in appellant's contract is sufficiently clear to place appellant on notice that the "spent abrasive blast material (contaminated with a known hazardous waste)" would "contain lead, cadmium and chromium."

Appellant also cites to the Navy's past practice of approving change orders on other fixed-price paint removal contracts as evidence that Standard Item 009-32 should be interpreted narrowly (app. br. at 3). While the governments past practice might explain why appellant was willing to take the risk of underbidding the project if it encountered significant quantities of "hot" paint, it does not influence our interpretation of the contract's plain language.

Appellant also relies on evidence that the Navy changed its policy of approving change orders for hazardous paint removal during its consideration of appellant's REA, contending that the Navy retroactively applied its new policy to appellant's REA (app. br. at 120). Extrinsic evidence of subsequent policy changes has no bearing on the interpretation of the plain language of the contract. Indeed, if the contract language is clear and unambiguous, the plain language controls and extrinsic evidence is not allowed to contradict the plain language. *Coast Federal Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003); *Certified Construction Company of Kentucky, LLC*, ASBCA No. 58782, 15-1 BCA ¶ 36,068 at 176,133. Moreover, extrinsic evidence cannot impart ambiguity into an otherwise unambiguous contract. *Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1375 (Fed. Cir. 2002); *Tomahawk Constr. Co.*, ASBCA No. 41717, 93-3 BCA ¶ 26,219 at 130,486-87.

## E. Estoppel Argument

Appellant further contends that the government should be estopped from denying appellant's request for removal costs, because the government stated during the bid process that it would pay for the higher costs (app. br. at 122). A close review of appellant's request for specific clarification and the government's response demonstrates that the government's response was consistent with the contractual language and did not amount to an agreement that the government would pay for removal costs beyond the contracted amount.

With reference to the government's estimate of hazardous waste set forth in paragraph 3.5 of Work Item 077-01-001, the appellant asked:

> Since the requirements to accomplish removals differ greatly contractors utilize the government[']s quantities in generating their estimates of removal costs.
>
> If the amounts exceed the government[']s expectations and a mod is issued to cover the additional disposal costs it is

18

the contractor[']s right to include additional expenses for labor, lab fees, analysis etc. into the contract mod.

Please advise.

(Finding 8)

In response, government stated that it "uses historical data to estimate and provide the amount of hazardous waste. Anything beyond the amount listed will be negotiated and addressed by a contract modification." (Finding 8) This response is consistent with paragraph 4.1 of Work Item 077-01-001, which states that, if the "[h]azardous waste generated during the actual performance of the work" varies in "type and amount from waste listed in 3.5," the government may renegotiate for credit or increase pursuant to Paragraph (b) of 2.4 (*id.*).

Appellant's request for clarification was not limited to the removal costs associated only with the small quantities of hazardous paint (10 lbs.) and paint chips (20 lbs.) the government included in Work Item 077-01-001. Instead, its request focused on paragraph 3.5 generally. Therefore, it was logical to conclude, as the government did, that appellant's question addressed the government's estimate of 275 tons of "Spent Abrasive Blast Material (contaminated with a known Hazardous waste)" as well as its estimates of hazardous paint waste and paint chips.

Moreover, although appellant's request for clarification did address the "requirements to accomplish removals," it specifically did not mention or address OSHA requirements or other particular removal costs. Accordingly, the government's response focused only upon its estimate of hazardous waste to be generated during contract performance.

Finally, in asking for clarification, appellant stated that "contractors utilize the government[']s quantities in generating their estimates of removal costs" (finding 7). This statement logically implies that the appellant would rely on the government's estimate of 275 tons of spent abrasive material in estimating appellant's removal costs.

## F. Constructive Change

Finally, we address whether the additional costs incurred during paint removal were the results of a constructive change. The Changes clause of the contract provides that a change includes "any act or omission to act on the part of the Government in respect of which a request is made for equitable adjustment" (finding 23). Under the contract's Changes clause, the government is liable for delay and increased costs when it demands work not required by the contract's plans and specifications. *ECC, International*, ASBCA No. 55781, 13 BCA ¶ 35,207 at 172,737. A constructive

19

change is work performed in response to an informal change order or due to the government's fault. *Int'l Data Products Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). For a contractor to recover for a change, the person acting for the government must possess authority to modify the contract. *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007); *Northrop Grumman Systems Corp. Space Systems Div.*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,242. If a contractor performs work that cannot be characterized as additional work under the contract, it does not constitute a change. *Int'l Data*, 492 F.3d at 1325. Appellant bears the burden of proving the elements of a change. *Die-Matic Tool Co.*, ASBCA No. 31185, 89-1 BCA ¶ 21,342 at 107,603, *aff'd*, 889 F.2d 1100 (Fed. Cir. 1989) (table).

Appellant has not demonstrated that the additional costs incurred by its subcontractor in complying with worker protection requirements during paint removal were the result of a constructive change. In particular, appellant has not provided evidence that the government compelled it to perform work that was not required by the terms of the contract. As we discussed above, the plain language of the contract indicates that the paint removal work – and any necessary worker protection requirements – were required by the terms of the contract.

Instead, the evidence shows that appellant willingly performed the work under the assumption that the government would agree to an increase in the contract price and that the government consistently maintained that the work was within the scope of the contract. Appellant kept the government apprised of its paint sampling results with its periodic submission of Inspection Deficiency Reports (IDRs) (finding 42). Relying on the Navy's "history of paying contractors additional money to remove paint based on the concentrations of heavy metals identified in paint sample analysis," appellant apparently assumed that the government would agree to an increase in the contract price to cover the OSHA requirements for safely removing and handling the paint based on the IDRs (*id.*). The government never substantively responded to IDRs 98, 86 or 74, but directed appellant to continue with the work and suggested that appellant submit a formal REA for any additional costs to which it believed it was entitled (finding 43).

Moreover, in its responses to appellant's specific inquiries regarding reimbursement for additional paint removal costs, the government consistently maintained that the cost of removing paint containing heavy metals was covered by the terms of the contract and directed appellant to continue with the basic work items set

forth in the contract (finding 44). Therefore, appellant has not established that the government compelled it to perform additional work that was not required by the terms of the contract.

Dated: 19 January 2017

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59281, Appeal of South Bay Boiler Repair, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

21